[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The instant proceeding finds its genesis in a complaint alleging intentional, deliberate and malicious interference with business expectations and business relations. The plaintiffs (hereafter "Trustees") were the owners and prospective developers of a certain tract, piece or parcel of land situated on Nod Hill Road and Old Branchville Road in the Town of Ridgefield, County of Fairfield in the State of Connecticut.
That tract consisted of approximately forty-nine (49) acres and was the subject matter of a submission to the Ridgefield Planning and Zoning Commission for the approval of a planned residential development. The Commission approved that application which was shown and designated on a certain map entitled, "Final Plan Nod Road A Planned Residential Development" under date of January 30, 1986, which map was amended October 6, 1986, finally amended October 16, 1986, and map is on file in the office of the Town Clerk of Ridgefield as Map No. 7361. The Commission endorsed its approval for filing on November 18, 1986, and that filing occurred on November 19, 1986. Included within the approval, were certain conditions, one of which required the Trustees to convey approximately eighteen (18) acres more or less of the subdivision to the Town of Ridgefield to be dedicated to open space.
In the early 1970's, the Department of Transportation inaugurated a plan to construct a new controlled access highway to replace the then and currently existing Route 7 between Norwalk and Danbury. It appears as though the department conducted extensive surveying and filed what might be appropriately termed taking maps in the office of the town clerk of Ridgefield on February 15, 1972. In the mid-80's, the Trustees, certainly being conscious of the information existent in the community concerning the Department of Transportation's plans for the reconstruction, made inquiry of the department as to status of the construction taking and whether or not any CT Page 8560 condemnation proceedings existed against this piece of property. On two occasions, they were advised that there were no condemnation proceedings against this property, there had been no taking of this property, and the plans for all intents and purposes were lying dormant.
Armed with those two separate assurances from the department, the Trustees conveyed eighteen (18) acres more or less of the approved subdivision to the Town of Ridgefield as open space in accordance with the condition of approval. This was done in November, 1986, the day following the filing of their approved map. During that same month, they began construction of the subdivision roadway. Thereafter, on January 30, 1987, the Department of Transportation advised the Trustees that the State of Connecticut would proceed at that time to acquire a portion of their property. Thereupon, the Trustees advised the department in early April of 1987 that they had ended any activity with respect to construction in the proposed subdivision as a result of the pending acquisition of a portion thereof. The department reiterated its notice to them as well as to say that the plans to acquire a portion of their property were proceeding and that appraisals had been scheduled. This was on May 20, 1987.
However, in the latter months of 1987, the Governor's Screening Committee became concerned over the wisdom of the purchase. In March of 1988, the Trustees were informed that the plan to acquire a portion of their property had been postponed indefinitely and from thereon there would be no negotiations regarding any price for the acquisition.
This termination and disclaimer of any interest in additional efforts and negotiations gave rise to an action by the Trustees against the State alleging an inverse condemnation of their property. In due course, negotiations reopened and continued resulting in a settlement of the action. The terms of the settlement were that the State would pay the Trustees the sum of two million eight hundred thousand ($2,800,000) dollars. The Trustees in lieu of condemnation would convey two parcels of property to the State. Those two parcels aggregated eighteen (18) acres and were not contiguous. The first of the two was a ten (10) acre parcel, more or less, which was carved from the open space area and the second was an eight (8) acre parcel from the "unencumbered" approved subdivision. In order to fulfill the Trustees' obligation under this settlement agreement, it was necessary to reacquire title to the ten (10) acre parcel which CT Page 8561 had been conveyed to the Town of Ridgefield. A proposal was submitted to the municipality wherein an equal size parcel from the subdivision itself was to be substituted and the town was to reconvey the ten (10) acre parcel necessary to effectuate the settlement to the Trustees.
In February of 1989, favorable municipal administrative action on the proposed substitution was obtained from the Board of Selectmen, the Conservation Commission, and the Planning and Zoning Commission. These approvals were ratified and confirmed at a town meeting on February 22, 1989. Immediately thereafter, the Trustees and the State executed a stipulation which was submitted to, approved by and made a judgment of the Superior Court on March 6, 1989. A copy of that stipulation is appended hereto and incorporated herein where applicable as Appendix I. The parcels in issue addressed therein were Parcel A, 10.271 acres, and Parcel C, 8.230 acres.
Paragraph 2b of the judgment provided that the conveyance of Parcel A was for "no consideration." The entire two million eight hundred thousand ($2,800,000) dollars was paid for Parcel C. The judgment also required interest at the rate of 10 percent per annum to be paid forty-five (45) days from the date of its entry. The interest requirement which might well be construed as a penalty of sorts against the State for late payment and expedited the closing on the property prior to April 21, 1989, when that interest was scheduled to accrue.
The defendants, John P. Cooke and Torrey M. Cooke, are the owners of a certain tract, piece or parcel of land situated on the southeasterly side of Old Branchville Road in the Town of Ridgefield, County of Fairfield, and State of Connecticut which partially abuts the Trustees' property on what might generally be defined as the northerly boundary of the northeast segments.[1] These neighbors became formidable opponents of the Trustees' subdivision, and the defendant John was heard to express that opposition at the town meeting on February 22, 1989. Being dissatisfied and disappointed with the result of that meeting, Torrey M. Cooke, brought an action on March 8, 1989 for a temporary injunction by virtue of an order to show cause against the Town of Ridgefield and the State to preclude the property exchange. As a result of that pending litigation, the First Selectperson of Ridgefield did not execute or deliver the deed contemplated by and approved by the town meeting. It goes without saying that the closing never occurred. The Attorney CT Page 8562 General representing the State moved to dismiss the complaint, alleging a lack of standing by Cooke to prosecute the allegations concerning a violation of certain statutory trusts enacted for public and charitable use. On April 14, the day following the motion to dismiss, Cooke filed an amendment to her complaint and attempted to obtain a writ of mandamus against the Attorney General to enforce the statutory charitable trust created by the Trustees' donation to the town for the open spaces. The Attorney General countered the amendment with a second motion to dismiss the amended complaint as well.
On August 1, 1989, the court granted the Attorney General's motion expressly finding that Cooke had no standing to bring, to present or maintain the action. The ruling was also dispositive of the issue directed toward the enforcement of the charitable trust. The court noted that "[t]he remedy sought by the plaintiff is to prohibit exchange not examine its efficacy and appropriateness."[2] Cooke filed an appeal on August 17, 1989, and on October 17, 1989, the Appellate Court dismissed the appeal on the basis of a lack of subject matter jurisdiction. Litigation expenses on behalf of the defendants was paid for by John P. Cooke.
The Trustees, frustrated by the defendants' vehement attempts to preclude the consummation of the stipulated judgment at the public hearing and in the ensuing litigation, agreed with the State to open the judgment and substitute Parcel B for Parcel A. The necessary exchange between the town and the State was now under the purview of that agreement. The closing on the substituted parcels occurred on January 26, 1990, and the consideration was paid to the Trustees.
During the defendants' extremely active opposition, Torrey Cooke complained to the Ridgefield Police Department and the Ridgefield Zoning Enforcement Officer that one of the Trustees, Lecher, was removing rocks from a stone wall on the property. Lecher denied this activity and no proof of that conduct was ever offered by the defendants. The Ridgefield Police Department closed the file on the complaint and the Zoning Enforcement Officer found no violation whatsoever. Lecher next prepared to fill some low spots on the proposed roadway with construction debris. The defendant Torrey again complained to the Ridgefield zoning authorities that the action was in violation of the regulations. Again, no offer of proof much less evidence of such a violation was presented at any time including the trial of this CT Page 8563 matter. Perhaps the state of mind of the defendants Cooke is best expressed by a letter Torrey wrote to one Inglese about Lecher. "If the man is mad because I am holding up his $2,800,000 from DOT because of a lawsuit, should he trash that very land he is selling?"[3]
The defendants assert that their intent was indeed the recognition of the quality of Parcel A over Parcel B as Parcel B is wetlands. However, they offered no evidence nor any offer of proof to satisfy that statement. The Trustees believe, and indeed assert, that the defendants' ads are self-serving and malicious acts rather than pure, altruistic and public spirited. They cite the fact that the Trustees were required to pay the defendants twenty-two thousand five hundred ($22,500) dollars for a new well on the defendants' property. The defendants never drilled that well which could in fact have been completed at a sum of between three thousand five hundred ($3,500) dollars and five thousand ($5,000) dollars. The second illustration which the Trustees seized upon is John Cooke's demand that the Trustees pay him and his wife one million ($1,000,000) dollars and they would "go away." The final example of bad faith of the defendants is demonstrated by their conduct after Parcels B and C were conveyed to the State. The attempt to exercise the "option" they had to purchase Lot No. 1 in the subdivision, even though the option is clear on its face that it is subject to defeasance by condemnation or by a deed to the State in lieu of said condemnation. That "option" appears as Appendix II appended hereto and fully incorporated herein.
The defendants have responded to the Trustees' complaint with an answer and two special defenses. The first recites that the open space property which was to be conveyed to the State of Connecticut in accordance with a judgment entered in accordance with the stipulation is indeed subject to a charitable use or trust and must be maintained in perpetuity as open space. Conveyance from the town to the Trustees for the purpose of reconveyance to the State in accordance with such judgment is violative of Secs. 47-2 and 45-79 of the General Statutes.
The second special defense alleges that a contract between the Trustees and the defendants, dated on or about November 6, 1986, which in essence mandated the Trustees maintain the subdivision plan for open space in perpetuity of the portion abutting the defendants' property, constituted consideration for the defendants' not to oppose that application nor to appeal its CT Page 8564 approval. After alleging the satisfaction of that contractual obligation by the defendants, they assert that the Trustees induced the town to breach its obligation as a trustee under the cited statutes by the vehicle of the judgment entered upon the stipulation wherein the originally designated open space property was to be conveyed to the State of Connecticut.
The defendants have also filed a counterclaim in two counts alleging an anticipatory breach of the November 6, 1986 contract "as a result of which defendants have been injured." The second count of the counterclaim incorporates the first by reference and attempts to invoke the provisions of Sec. 42-110b et seq. of the General Statutes. (Connecticut Unfair Trade Practices Act — CUTPA.)
The prayer for relief demands a temporary and permanent injunction restraining the Trustees from "breaching their agreement with the defendants," and money damages from the Trustees on the CUTPA claim, together with punitive damages, costs and counsel fees under CUTPA.
We in Connecticut have long recognized the cause of action for tortious interference with contractual rights or other business relations, and have unequivocally declared that not every act which disturbs the contract or business expectancy is actionable. A successful plaintiff is required to satisfy the threshold requirement that the defendants' conduct be in fact tortious. This requirement may be satisfied by proof of fraud, misrepresentation, intimidation, molestation or malice. While this cause requires more than the proof of the existence of a business relationship, the defendants' interference therewith and the resulting loss to the plaintiff, the plaintiff must also plead and prove at least some improper motive or improper means. "`[A] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself.'" Blake v. Levy, 191 Conn. 257, 262.
The Blake court relied extensively on the restatement to resolve the issue of whether or not an actor's behavior is improper. In determining whether or not an actor's conduct which intentionally interferes with a contract or a prospective contractual relationship with another is improper consideration given to the following factors: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interest sought to be advanced by the actor, (e) the social interests in CT Page 8565 protecting the freedom of action of the actor and the contractual interest of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." Blake v. Levy, supra, 263 n. 3, citing to 4 Restatement (Second), Torts, Sec. 767 (1979).
The factual predicate necessary to establish a valid business relationship or expectancy has been set forth at length by the court earlier in this decision. The Trustees' relationship with the State of Connecticut with its agreements and controversy ultimately was settled and memorialized in a stipulation, and declared to be a judgment by the court. This is more than adequate. One need not undertake an experience in the land of fantasy to find that that judgment would have been satisfied by both parties had not the defendants instituted a proceeding for injunctive relief to prevent that satisfaction. The net effect of that procedure was to frustrate the satisfaction of the judgment. The issue of the defendants' knowledge of that relationship or expectancy requires nothing more than a mention that the defendants admitted knowing of the exchange between the Trustees and the Department of Transportation.
Was there indeed an interference with the plaintiffs' business relationship or expectancy? This question cries out for an affirmative response. Litigation was instituted prior to the satisfaction of the judgment. While the litigation failed at the trial level and also in the appellate proceeding which followed the dismissal in the trial court, its purpose was successfully accomplished. The evidence offered clearly establishes that the First Selectperson of the Town of Ridgefield refused to execute the deed in satisfaction of the judgment as a result of their pending litigation. While the litigation was the primary attack, the defendants pursued secondary efforts by writing to local and state officials in an attempt to prevent the exchange from occurring.
In speaking to the issue of an improper motive or the means of the interference, the court takes its guidance from Blake v.Levy, supra, and its use of 4 Restatement (Second), Torts, which again has been cited earlier in this memorandum. The testimony as well as the conduct of the defendants is interesting but strikingly transparent. The prospect of the aesthetic observation of woodlands from Cooke's living room window obstructed or inhibited by a dwelling were unpleasant and upsetting to him. Their mission to protect their property was CT Page 8566 quite obvious in their appearances before the municipal bodies and their participation in the municipal legislative process. The juxtaposition of their well with respect to the Trustees' property proved to a source of a demand that the plan be amended so as not to cause their own water supply to be placed in jeopardy. Their efforts achieved a degree of success in that the Commission, in prescribing conditions for the approval of the subdivision, required that two lots be combined immediately adjacent to their property into one large lot and that the Trustees would drill a new well together with the necessary piping therefor to provide them with potable water. At an early stage in the proceeding, the defendants' litigation utilizing the appellate process from the approval by the Planning and Zoning Commission led to the agreement by which the Trustees were to drill a new well accompanied by the necessary system to provide them with drinking water and, more importantly, to grant them an "option" to purchase the new oversized lot for a consideration which may be best described as a substantially discounted purchase price.
The consideration the defendants promised in the agreement was their commitment to refrain from opposition to the development of the subdivision. The Trustees have established that the defendants have blatantly violated that commitment.
One must examine the litigation pursued by the defendants to determine whether or not it was a valid exercise of their legal rights or an improper interference designed to frustrate the judgment entered by the court in accordance with the stipulation of the parties. The defendant Torrey's attempt to clothe herself with the mantle of a protection of open spaces never survived the motion to dismiss because the trial court correctly ruled, which ruling survived the scrutiny of appellate review that she had no legal right or standing to institute or to pursue that proceeding. Standing is a fundamental requisite to evoke the jurisdiction of the court. An analysis of the injunctive procedure and subsequent appellate review can only lead to the conclusion that the action was indeed obstructive and contemplated frustrating the judgment. The complaints which she made to the police department and the Zoning Enforcement Officer which evoked the response from each of those agencies produced no suggestion of validity and provide another example of obstructionism and interference.
The scenario with the Wier Farm property also serves to quite CT Page 8567 adequately demonstrate the mental state of the defendants. The defendant Torrey who professed an interest in ecology claimed to be very disturbed by the proposed exchange of Parcel A for Parcel B. After describing the parcels, she testified that she believed that such an exchange would have a damaging erred on the Wier Farm property. Expressed in terms of a charitable interpretation, one might argue that her motive was altruistic. That argument pales with the revelation that the Wier Farm project manager endorsed, approved and indeed supported the exchange of land. Despite her poor ability to recall any information or documentation or statement to support her posture at trial, it became evident that this particular conduct was also designed to preclude and to frustrate the satisfaction of the judgment.
While it may well be argued that these acts of the defendants were motivated by their dedication to project, to preserve, and to advance the public good, that argument is easily recognized as fatally flawed when the cumulative effect of these acts is considered. Those various and sundry acts, together with the initial "extractions" obtained from the Trustees by the Cookes, the funds which the Trustees paid to them for the potable water system which might suggest the word extortion to a lay person and the comment, "[p]ay me a million dollars for my property and I will go away," all of which the court finds to be credible, constrains it to find that the motive indeed was malicious and the interference resulting in the injury is certainly wrong beyond the fact of the interference itself. See Top Service BodyShop, Inc. v. Allstate Ins. Co., 283 Or. 209; Blake v. Levy, supra.
The nexus between the tortious conduct and injury to the Trustees becomes immediately apparent. The malicious motivation and the obvious success of the improper conduct lead to a single inescapable conclusion, and that is that the Trustees were indeed damaged by these acts of the defendants. The evaluation of those damages, however, is most difficult to ascertain. The stipulation between the Trustees and the State of Connecticut resolving the litigation sounding in inverse condemnation was executed on February 28, 1989, and provided, inter alia, in paragraph 2a thereof:
 Interest at the rate of 10% per annum shall accrue on said sum commencing 45 days from the date of Court approval of this Stipulation. CT Page 8568
That sentence was deleted in the judgment entered by the court on the stipulation. A substitution of "[t]he parties shall close this transaction within forty-five days of the date upon which the Superior Court enters an order granting this Motion to Reopen Judgment. Time shall be of the essence." The Trustees take that 10 percent and would apply it to the nine (9) months in five (5) days which elapsed between the scheduled closing and the actual date of closing. The computation of interest on two million eight hundred thousand ($2,800,000) dollars at that 10 percent figure is two hundred thirteen thousand eight hundred eighty eight dollars and ninety ($213,888.90) cents. That penalty prior its deletion was the obligation of the State. The argumentative application of that percentage rate and the number produced is fascinating. However, a mathematical computation does not necessarily establish damages, despite the nature of the defendants' interference and despite the fact that the tort had been made out and damages have occurred. In view of the lack of persuasive evidence on the measure of damages, the court finds certainly that the Trustees are entitled to nominal damages and awards the sum of one ($1) dollar. The award, however, does not end with this determination. The prayer for relief from the plaintiffs' complaint includes a claim for punitive damages. This court is satisfied that the validity of such a claim, as framed by these facts and these findings, is indeed justified. The Trustees are, accordingly, ordered to claim the issue of punitive damages for hearing and the award of so much thereof as may be appropriate.
The defendants' special defenses claiming a charitable use or trust impressed upon the property and the violation of the agreement between the parties under date of November 6, 1986[4]
have certainly not been established. The injunctive action instituted by the defendants against the Attorney General and the local municipality which was directed at preventing the town from conveying the open space property conveyed to it by the Trustees, in accordance with the stipulation which was reduced to judgment as previously recited, is legally and factually inadequate. That conveyance simply never occurred, and therefore any claim the defendants may have in support of the charitable trust argument cannot be reached on this factual predicate. The question of standing to raise such an argument, which was addressed adversely to the defendants by the court, Geen, J., in her opinion, remains the law of the case. This court finds it unnecessary to reach or discuss that opinion beyond that holding. CT Page 8569
The first count of the defendants' counterclaim sounds in the anticipatory breach of the agreement between the parties dated November 6, 1986. Numbered paragraph 3 of that agreement recites: "For a period of six (6) months following the expiration of the five (5) year period described in paragraph 2e above, the Cookes shall have an option to purchase Lot #1 at a price equal to 85% of the fair market value as determined by an independent MAI certified real estate appraiser agreed upon by the parties. Notice of the exercise shall be by certified mail prior to April 21, 1992 otherwise this provision shall be void. The foregoing option right is subject to possible condemnation by the State of Connecticut for highway purposes or deed to the State of Connecticut in lieu of said condemnation." In support of that claim, they postulate that no condemnation occurred and that the Trustees' suit against the State of Connecticut alleging an inverse condemnation was not a condemnation in any sense of the word. They also assert that the stipulation for judgment entered into between the parties to settle that litigation, which stipulation became a judgment, was neither a condemnation nor a deed in lieu of condemnation. The argument is neither logical nor persuasive and is little more than pure nonsense.
The court finds it unnecessary to discuss the rubrics of a condemnation. However, when one's land is so diminished by the action of the State, or pending action of the State, as to be rendered virtually valueless, or its value substantially diminished, such an action lies (inverse condemnation). The effect of the action in this case was to compel what indeed was a condemnation. While the judgment was predicated upon a negotiated settlement, the effect of that settlement is to cause the State to own the property and the Trustees to be paid the fair market value of that property. To argue that this is not a condemnation borders on being ludicrous. The referenced paragraph[5] was found by this court to create a condition of defeasance. That condition occurred and the agreement, despite part performance by the Trustees with respect to the conditions impressed upon the approval and the obligation which was consummated to provide a new water system for the defendants, fell under its own weight. The argument offered in support of the claim of bad faith in the argued breach of the implied covenant of good faith and fair dealing neither established bad faith nor the "most egregious acts of bad faith" as postulated by the defendants.
As to the second count, and the cause of action asserting a CT Page 8570 CUTPA violation, this seems to find its way into and make a rather grand entry in many if not most of the cases which come before the court. None of the requisites set forth underCheshire Mortgage Service, Inc. v. Montes, 223 Conn. 80 orMcLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 567-68, cited by the defendants, have been established by credible evidence offered in support of that theory. Those requisites generally are the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by the statutes, common law, or otherwise, whether, in other words, it is within at least the penumbra of some common law, statutory or other established concept of unfairness. It cannot be said to be immoral, unethical, oppressive or unscrupulous and the evidence of a substantial injury to consumers, other than a defendant's displeasure with the impending actions and ultimate result of this action, finds no basis of support in the evidence. The claim for relief under CUTPA has not been approximated much less proven.
Despite the fact that the causes of action set forth in the counterclaim cannot be decided favorably to the defendants, the court would be remiss if it did not mention their claim for damages. There was no evidence whatsoever from an expert as to the fair market value of the property of which they claim they were deprived. The defense certainly recognized and expressed the existence of an equitable conversion by virtue of the agreement dated November 6, 1986, yet made no attempt to direct questions to either of the defendants as the equitable owners of the property to express their opinion as to the fair market value thereof. The approach they pursued was to utilize the amount of money paid to the Trustees by the State of Connecticut for the acreage taken. It was suggested that to find the fair market value of the subject matter of the plaintiffs' Exhibit 6 that the number of acres merely be divided into the purchase price and the fair market value would be established in that fashion. Assuming, arguendo, without agreeing, that this approach constitutes a valid method of establishing the fair market value of property, it is nevertheless unpersuasive. Of the total acreage conveyed, an entire parcel was specifically excluded from any consideration paid by the State of Connecticut. The very best that can be offered is to mathematically compute the fair market value recognizing the diminution of acreage and to accept the premise that no consideration was paid for that parcel. It insults one's intelligence to suggest that the parcel for which no consideration was paid is totally worthless. If this were an CT Page 8571 acceptable method of proving fair market value of property, it cannot be utilized in this case.
Judgment may enter for the plaintiffs on the complaint, and they are awarded the sum of one ($1) dollar as nominal, general damages. The plaintiffs, however, are further ordered to schedule a hearing to offer evidence on the issue of punitive damages. Judgment may also enter for the plaintiffs on the defendants' counterclaim.
Moraghan, J.
APPENDIX I
NO. CV-88-0295189 S : SUPERIOR COURT
NICHOLAS R. DiNAPOLI, JR., TRUSTEE, ET AL : JUDICIAL DISTRICT OF DANBURY,
VS. : AT DANBURY
J. WILLIAM BURNS, COMMISSIONER OF TRANSPORTATION : FEBRUARY 28, 1989
STIPULATION
The parties hereby stipulate that a judgment shall enter, without costs, as follows:
1. In lieu of a condemnation taking by the State of Connecticut, the defendant will accept and the plaintiffs will immediately convey, by warranty deed, upon approval to convey "Parcel A" to the defendant at a duly held Town meeting, title to the real property shown as Parcel "A", consisting of 10.271 acres, together with Parcel "C", consisting of 8.230 acres "to be conveyed to the State of Connecticut, CT Page 8572 Department of Transportation" on a map entitled "Final Plan, Nod Hill, A Planned Residential Development, Nod Hill Old Branchville Roads, Ridgefield, Connecticut, Scale 1" = 100', January 30, 1986, certified substantially correct by C. James Osborne, Jr., Amended October 6, 1986, Amended October 16, 1986, Amended January 25, 1989, and Revised February 21, 1989", which map is attached hereto.
2. a. In return for said warranty deed for Parcel "C", as shown on said map, the defendant will cause the State of Connecticut to pay the plaintiffs the sum of $2,800,000.00. Interest at the rate of 10% per annum shall accrue on said sum commencing 45 days from the date of Court approval of this Stipulation.
b. The plaintiff will convey Parcel "A", as shown on said map, to the defendant for no consideration.
3. With respect to the issues raised in the Complaint in this action, the provisions contained in Paragraphs One and Two of this Stipulation shall be a full and final settlement of the claims and rights of each party as against the other.
 THE PLAINTIFFS, Nicholas R. DiNapoli, Jr., Trustee, and Carl H. Lecher, Trustee,
 By _________________________________ Jack D. Garamella, for Cutsumpas, Collins, Hannafin, Garamella, Jaber Tuozzolo, P. C. Their Attorneys
 THE DEFENDANT, J. William Burns, Commissioner of Transportation,
 By _________________________________ William A. McQueeney, Assistant Attorney General His Attorney
 ORDER
Judgment shall enter in accordance with the above Stipulation. CT Page 8573
THE COURT
 __________________________ Judge
THIS IS TO CERTIFY that a copy of the foregoing was mailed to all counsel of record on this 28th day of February, 1989.
 __________________________ Jack D. Garamella
CV 88 0295189 S } No. ------------- } }
Nicholas R. DiNapoli, Jr., Trustee } — ------------------------------------------- } STATE OF CONNECTICUT vs. } SUPERIOR COURT } Judicial District of J. William Burns, Commissioner of Transport. } Danbury — ------------------------------------------- }
 I, Therese A. Servas, Clerk of the Superior Court for the Judicial District of Danbury, hereby certify that the within and foregoing is a true copy of the original Stipulation dated February 28, 1989 and order thereon dated March 6, 1989 _____ in said cause, as on file and of record appears.
 In witness whereof, I have hereunto set my hand and the Seal of said Court at Danbury in said Judicial District, this 6th day of March 1989
Therese A. Servas, Clerk
[EDITORS' NOTE: THE MAP IS ELECTRONICALLY NON-TRANSFERRABLE.]
APPENDIX II
Agreement made this ______ day of October, 1986 by and between John P. Cooke and Torrey M. Cooke (hereinafter "Cooke") of Old Branchville Road, Town of Ridgefield, County of Fairfield, and State of Connecticut and Carl H. Lecher, Trustee and Nicholas R. DiNapoli, Trustee (hereinafter "Owners") both of the Town of Ridgefield, County of Fairfield, and State of Connecticut collectively the "parties" CT Page 8574
WHEREAS the Owners have subdivided 49.720 acres into 19 lots (Subdivision) as shown and described on a certain map entitled "Final Plan, Nod Hill, A Planned Residential Development, Nod Hill and Old Branchville Roads, Ridgefield, Connecticut", dated Jan. 30, 1986 and revised thereafter and prepared by C. James Osborne, Jr., which subdivision was approved by the Planning and Zoning Commission on October 21, 1986;
WHEREAS the parties are abutting property owners and it is to their mutual best interest to enter into this agreement;
In consideration of the promises contained herein and other valuable considerations, the parties agree as follows:
1. The Cookes agree not to oppose directly or indirectly the development of the Subdivision or appeal the decision by the Planning and Zoning Commission approving the subdivision.
2. The Owners agree as follows:
a. To drill a new water well prior to the completion of the access road and drainage but no later than June 30, 1987 at owners cost on the Cookes property. The Owners will provide the Cookes with a well driller report and Health Department approval of the well;
b. To complete and install a well line to the house including the installation of a new water line installed to the dwelling including excavation, casing, piping below the frost line, wiring, back fill, rough grading, restoration of landscaping and disturbed areas, and the installation of a new "well saver" or equal submersible pump all at owners cost;
c. To place a fifty foot (50') green belt easement on Lot No. 1 which easement area shall remain in its natural state except for normal yard maintenance;
d. That the abutting two (2) lots shown on the January 30, 1986 subdivision plan will be merged into one (1) lot as shown on the above entitled map as Lot No. 1 consisting of 1.917 acres;
e. That Lot No. 1, 1.917 acres abutting the Cooke property will not be built upon until after October 21, 1991.
3. For a period of six (6) months following the expiration of the five (5) year period described in paragraph 2e above, the Cookes shall CT Page 8575 have an option to purchase Lot #1 at a price equal to 85% of the fair market value as determined by an independent MAI certified real estate appraiser agreed upon by the parties. Notice of exercise shall be by certified mail prior to April 21, 1992 otherwise this provision shall be void.
This agreement shall bind the heirs, executors, successors, and assigns of the parties.
_______________________________ _________________________________ Nicholas R. DiNapoli, Trustee _______________________________
_______________________________ _________________________________ Paul S. McNamara Carl H. Lecher, Trustee
_______________________________ Bernadette F. Librizzi
_______________________________ _________________________________ John P. Cooke _______________________________ _________________________________ Torrey M. Cooke
STATE OF CONNECTICUT ss. Ridgefield November __, 1986 COUNTY OF FAIRFIELD
Personally appeared Nicholas R. DiNapoli, Trustee signer and sealer of the foregoing instrument and acknowledged the same to be his free act and deed, before me,
________________________________
STATE OF CONNECTICUT ss. Ridgefield November 6, 1986 COUNTY OF FAIRFIELD
Personally appeared Carl H. Lecher, signer and sealer of the foregoing instrument and acknowledged the same to be his free act and deed before me,
 __________________________________ Commissioner of the Superior Court
CT Page 8576
STATE OF CONNECTICUT ss. Ridgefield November __, 1986 COUNTY OF FAIRFIELD
Personally appeared John P. Cooke and Torrey M. Cooke signers and sealers of the foregoing instrument and acknowledged the same to be their free act and deed, before me,