558

## McLaughlin Ford, Inc. *v.* Ford Motor Company (11123)

Speziale, C. J., Peters, Healey, Shea and Grillo, Js.

Argued January 5—decision released April 3, 1984

*Philip F. Spillane,* for the appellant (plaintiff).

*Philip S. Walker,* with whom, on the brief, was *David B. Broughel,* for the appellee (defendant).

*Mary-Anne Mulholland* and *Robert M. Langer,* assistant attorneys general, with whom, on the brief, was *Joseph I. Lieberman,* attorney general, filed a brief and argued to the court as amici curiae.

SHEA, J. This appeal concerns a franchise agreement entered into by the plaintiff, McLaughlin Ford, Inc. (McLaughlin), and the defendant, Ford Motor Company (Ford).

The principal issues presented involve the applicability of the Connecticut Unfair Trade Practices Act (CUTPA); General Statutes §§ 42-110a through 42-110g; to nonconsumers, such as automobile manufacturers and dealers. The first count of the complaint alleged that Ford had breached the franchise agreement in several respects by the appointment of another Lincoln-Mercury dealer at a location seven and one-half miles from the plaintiff. The second count repeated the allegations of the first count and added a paragraph claiming that Ford had committed unfair trade practices in violation of CUTPA. On the first count the trial court found a breach only of a procedural requirement of the franchise agreement requiring a hearing before the dealer policy board established by Ford and issued an injunction to secure compliance therewith. The injunction was dissolved after this procedural deficiency had been rectified.[1] On the second count judgment was rendered for the defendant, the court finding that no unfair trade practices had been proved against Ford. Although the plaintiff's appeal

[1] The court found that the agreement did not prohibit Ford's decision to replace the previous franchisee because Ford was not appointing an *additional* dealer, but was replacing a preexisting dealer. The court found, however, that one subparagraph required Ford to make a market study, and that another subparagraph gave McLaughlin the right to a hearing before

encompasses both counts, it has briefed no issues related to the first count and any claims of error in the judgment on that count must be treated as abandoned. *Czarnecki* v. *Plastics Liquidating Co.*, 179 Conn. 261, 262 n.1, 425 A.2d 1289 (1979); *Sachem's Head Assn.* v. *Lufkin*, 168 Conn. 365, 366, 362 A.2d 519 (1975). With respect to the second count the plaintiff claims that the court erred (1) in denying a motion to amend the complaint after both parties had rested and (2) in failing to apply the proper test for determining whether a party has committed unfair trade practices. We find no error.

The facts found by the trial court are as follows: On June 1, 1972, Ron Kelly Ford, Inc., (Kelly) of New Milford entered into a sales and service agreement with Ford designating Kelly as the dealer for Mercury products in the New Milford locality.[2] The rights under this agreement were transferred to McLaughlin on August 6, 1973, and from that date McLaughlin has been the dealer of Ford-Mercury products in the New Milford locality.

In the sales and service agreement governing Ford's relationship with McLaughlin, Ford retained the right to determine "the numbers, locations and sizes of authorized dealers necessary for proper and satisfactory sales and service representation for [Ford's products] within and without the DEALER'S LOCALITY." Ford also retained the right to "appoint additional dealers in VEHICLES within or without the

the dealer policy board. The court further found that an informal study done by Ford satisfied its contractual duties, and that all Ford was now obligated to do was give McLaughlin a meaningful hearing. That hearing was held, and subsequently, on October 30, 1981, the injunction was dissolved.

[2] The agreement provided that the post office communities of New Milford, Bridgewater, Gaylordsville, Kent, Lakeside, Marbledale, New Preston, Roxbury, South Kent, Washington, Washington Depot, Sherman and South Britain constituted the "New Milford locality."

DEALER'S LOCALITY except that, if an additional dealer [would] be within the DEALER'S LOCALITY and within ten (10) miles driving distance of the Dealer's principal place of business, [Ford would] not appoint the additional dealer unless a study made pursuant to subparagraph 9 (a) reasonably demonstrate[d], in [Ford's] opinion, that such appointment [was] necessary to provide VEHICLES with proper sales and service representation in such locality.'' Under the same provision McLaughlin was given thirty days to review the study and file objections with Ford. In turn, Ford was obligated to consider the objections prior to entering into negotiations with ''any dealer prospect.'' If McLaughlin's protestations were unsuccessful, McLaughlin had the right to appeal to the dealer policy board, a tribunal designed to resolve disputes between Ford and its dealers.

The procedural protections provided McLaughlin were subject to one exception: ''Nothing in this paragraph 9 shall restrict the right of the Company to appoint a dealer in VEHICLES as a replacement for a dealer in VEHICLES, or to fill an established open point for a dealer in VEHICLES, at or near a location previously approved by the Company.''

In July, 1979, Bragg Motors, a dealer of Lincoln-Mercury products in the Danbury locality,[3] ceased doing business. Thereafter, Ford began to search for a dealer to replace Bragg Motors, and eventually entered into an agreement of representation with Greentree Toyota (Greentree). Greentree's place of business is located in Brookfield, approximately seven and one-half miles from McLaughlin's place of business.

---

[3] The Danbury locality consists of the following post office communities: Danbury, Bethel, Botsford, Brookfield, Brookfield Center, Georgetown, Harleyville, Newtown, Redding, Redding Ridge, Ridgefield, Sandy Hook and West Redding.

Upon learning that Greentree was the most likely candidate to replace Bragg Motors, McLaughlin mailed two letters to the dealer policy board objecting to the appointment of Greentree. The board responded to both letters, informing McLaughlin that it believed McLaughlin's objections were premature because no recommendation for such an appointment had yet been made.

There was no further correspondence between the board and McLaughlin until the latter part of July, 1981, when McLaughlin was informed by letter that "the Board [was] constrained to support the Lincoln-Mercury Division's appointment of the Brookfield Toyota dealer." The board offered to discuss the matter further, but because of business exigencies, required the discussion to be held within the following week. McLaughlin again objected to the proposal, and requested an opportunity to review the market study referred to in the franchise agreement and also a hearing before the board. McLaughlin was informed on August 7 by wire, and in a letter dated August 10, that there was no market study and that a hearing was scheduled for August 12. McLaughlin declined to appear at the hearing, opting to institute on August 28 the civil suit that is the subject of this appeal.

Both parties[4] agreed to expedite the disposition of the case and then proceeded to trial on September 16, 1981.

I

The first claim of error concerns the denial of McLaughlin's motion to amend its complaint. McLaughlin contends that General Statutes § 52-128[5]

---

[4] Greentree had originally been named a party defendant, but was dropped prior to trial.

[5] General Statutes § 52-128 provides: "The plaintiff may amend any defect, mistake or informality in the writ, complaint, declaration or peti-

and Practice Book § 175[6] granted it an absolute right to amend its complaint within thirty days from the return date and that such time had not expired when the amendment was offered even though both parties had finished presenting evidence. The plaintiff further maintains that, even if it did not have an absolute right to amend its complaint, the court, nonetheless, abused its discretion in denying the motion.

We have frequently held that "[w]hether an amendment should be granted at the close of the plaintiffs' case lies within the sound discretion of the court." *Corcoran* v. *Jacovino,* 161 Conn. 462, 471, 290 A.2d 225 (1971); *Antonofsky* v. *Goldberg,* 144 Conn. 594, 598, 136 A.2d 338 (1957); *Yavis* v. *Sullivan,* 137 Conn. 253, 263, 76 A.2d 99 (1950). Here, the amendment was sought after the *defendant* had rested. It is inconceivable that either the statute or the rule was intended to restrict the discretion of judges in allowing amendments after commencement of trial and thus upset orderly procedures[7] simply because of the circumstance that, due to expedition of a case by counsel and the court,

tion, and insert new counts in the complaint or declaration, which might have been originally inserted therein, without costs, within the first thirty days after the return day and at any time afterwards on the payment of costs at the discretion of the court; but, after any such amendment, the defendant shall have a reasonable time to answer the same."

[6] Practice Book § 175 provides: "The plaintiff may amend any defect, mistake or informality in the writ, complaint or petition and insert new counts in the complaint, which might have been originally inserted therein, without costs, during the first thirty days after the return day."

[7] We note in this regard that General Statutes § 52-130 provides that "[a]ny court may restrain the amendment or alteration of pleadings, *so far as may be necessary to compel the parties to join issue in a reasonable time for trial.*" (Emphasis added.) In conjunction with General Statutes § 52-130, it appears reasonably clear that the legislature intends General Statutes § 52-128 to apply only when the trial has not commenced at the time when the amendment is offered. The construction of General Statutes § 52-128 proposed by the plaintiff creates an obvious inconsistency with General Statutes § 52-130; we decline to uphold such a result. Cf. *Vartuli* v. *Sotire,* 192 Conn. 353, 472 A.2d 336 (1984), and cases cited therein (legislature presumed to create one consistent body of law).

the trial has been virtually completed within thirty days of the return date. We hold that the right to amend without court approval as provided by § 52-128 and Practice Book § 175 is applicable only when the amendment is offered prior to commencement of trial.

Nor do we agree that the court abused its discretion in disallowing the amendment made at this late stage of trial.[8] "The trial court has wide discretion in granting or denying amendments before, during, or after trial." *Lawson* v. *Godfried,* 181 Conn. 214, 216, 435 A.2d 15 (1980); see also *Citizens National Bank* v. *Hubney,* 182 Conn. 310, 312, 438 A.2d 430 (1980).

It would be most exceptional to find an abuse of discretion in refusing an amendment offered, as here, at the close of evidence. *Freccia* v. *Martin,* 163 Conn. 160, 164–65, 302 A.2d 280 (1972); *Johnson* v. *Toscano,* 144 Conn. 582, 588–89, 136 A.2d 341 (1957). The proposed amendment was in the form of a substitute complaint which primarily elaborated upon the original allegations by referring to and reciting some additional provisions of the franchise agreement. Some new paragraphs were included which detailed the circumstances relating to the initial denial by the policy board of the existence of a market study and its failure to conduct a hearing. The trial court found virtually all of these facts as alleged by the plaintiff in rendering judgment in its favor on the first count. The legal claims of the plaintiff that the sequence of events demonstrated deception on the part of Ford or that the franchise agreement was unconscionable appear to have been considered on

---

[8] On September 21, during the course of a discussion with the court on the plaintiff's motion for a preliminary injunction, McLaughlin's counsel offered to amend the complaint. The court replied: "Wait with the amendment, I have a motion before me." The plaintiff's counsel reminded the court of this exchange on September 23, when he renewed his motion to amend. The court noted "I was taking care of the injunction first. I said I wasn't going to take up two matters. I didn't tell you to wait until you rested."

the basis of the evidence presented and were rejected. These CUTPA claims were within the scope of the original complaint which alleged "unfair or deceptive trade practices" generally. The only reference in the memorandum of decision to any deficiencies in the complaint is to the absence of any allegation of consumer deception or that "Ford's conduct is substantially injurious to consumers." The amended complaint did not seek to remedy this deficiency. The absence of demonstrable prejudice is a factor which strongly supports the conclusion that there was no error in the trial court's disallowance of the plaintiff's proffered amendment.

## II

The plaintiff's remaining claim of error concerns the trial court's ruling on the alleged CUTPA violations. In the memorandum of decision the court stated: " 'A trade practice is unfair when it offends established public policy and is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.' *Covenant Radio Corp.* v. *Ten Eighty Corp.*, 35 Conn. Sup. 1 [390 A.2d 249 (1977)], quoting *Spiegel, Inc.* v. *Federal Trade Commission*, 540 F.2d 287, 293 (7th Cir. 1976). The plaintiff has not alleged, and there has been no evidence, that the challenged conduct of Ford Motor Company is immoral, unethical, oppressive or unscrupulous. Likewise, there is no claim that Ford's conduct is substantially injurious to consumers. 'For a trade practice to be deceptive, it must have a tendency and capacity to deceive the consumer.' *Covenant Radio Corp.* v. *Ten Eighty Corp.*, supra. As there is no element of deception of consumers present or alleged, the plaintiff's allegation that Ford has committed a deceptive trade practice must fail."

In this appeal, the plaintiff maintains that the trial court erroneously limited CUTPA's protection to conduct involving consumer injury. McLaughlin further

maintains that, although Ford's conduct may not have been oppressive or unethical,[9] it was against public policy and was substantially injurious to McLaughlin. Any one of these factors alone, McLaughlin maintains, is sufficient to state a cause of action under CUTPA.[10] McLaughlin maintains, therefore, that the court erred in denying its requested relief on the second count.

## A

We agree with the plaintiff that CUTPA is not limited to conduct involving consumer injury. General Statutes § 42-110g (a) provides in part: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages." Person, as defined by the statute, includes: "a natural person, corporation, trust, partnership, incorporated or unincorporated association, and any other legal entity." General Statutes § 42-110a (3). The statute's coverage is broad and its purpose remedial. *Hinchliffe* v. *American Motors Corporation,* 184 Conn. 607, 616, 440 A.2d 810 (1981). The General Assembly has not

[9] Neither in its original brief, nor in its supplemental brief, does McLaughlin contest this factual determination of the trial court under the clearly erroneous standard. See Practice Book § 3060D; *Perrotti* v. *Massa,* 183 Conn. 16, 17, 438 A.2d 806 (1981). The plaintiff's counsel conceded, at oral argument, that Ford's conduct had not been unethical or oppressive.

[10] McLaughlin refers us to the criteria first announced by the federal trade commission in 1964:

"(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory or other established concept of unfairness;

"(2) whether it is immoral, unethical, oppressive or unscrupulous;

"(3) whether it causes substantial injury to consumers (or competitors or other businessmen)."

Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324, 8355 (1964).

seen fit to limit expressly the statute's coverage to instances involving consumer injury, and we decline to insert that limitation. We agree with the plaintiff that a competitor or other business person can maintain a CUTPA cause of action without showing consumer injury. See *Murphy* v. *McNamara,* 36 Conn. Sup. 183, 188, 416 A.2d 170 (1979); see generally Langer & Ormstedt, "The Connecticut Unfair Trade Practices Act," 54 Conn. B.J. 388 (1980).

### B

In order to prevail in a cause of action under CUTPA, the facts proved by the evidence must establish either "unfair methods of competition [or] unfair or deceptive acts or practices," which "have a potential effect on the general consuming public." *Ivey, Barnum & O'Mara* v. *Indian Harbor Properties, Inc.,* 190 Conn. 528, 533, 540, 461 A.2d 1369 (1983); see also *Conaway* v. *Prestia,* 191 Conn. 484, 491–93, 464 A.2d 847 (1983). The plaintiff maintains that the facts as found by the trial court, which are unchallenged, establish such unfair trade practices.[11] We disagree.

The legislature has directed that "courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5 (a) (1) of the Federal Trade Commission Act (15 U.S.C. 45 (a) (1))." General Statutes § 42-110b (b). We followed this mandate recently, and adopted the criteria set out in the "cigarette rule" by the federal trade com-

[11] The plaintiff also maintains that the facts as alleged establish the requisite public nexus. See *Ivey, Barnum & O'Mara* v. *Indian Harbor Properties, Inc.,* 190 Conn. 528, 461 A.2d 1369 (1983). Because we do not reach the issue, we express no opinion on this point. We note, however, that the General Assembly has recently decided to regulate the relationship between a manufacturer of automobiles and the manufacturer's dealer. See Public Acts 1982, No. 82-445 (codified as General Statutes § 43-133dd). The federal government and some twenty-five states have also concluded that regulation is necessary. See *New Motor Vehicle Board of California* v. *Orrin W. Fox Co.,* 439 U.S. 96, 101 n.5, 99 S. Ct. 403, 58 L. Ed. 2d 361 (1978).

mission for determining when a practice is unfair: "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)]." *Conaway* v. *Prestia,* supra, 492–93, quoting *FTC* v. *Sperry & Hutchinson Co.,* 405 U.S. 233, 244–45 n.5, 92 S. Ct. 898, 31 L. Ed. 2d 170 (1972); see footnote 10, supra.[12]

At the time McLaughlin initiated suit, there was no public policy, expressed by statute[13] or otherwise, prohibiting a manufacturer from exercising a right reserved in a contract to grant an automobile dealership to a competitor who was in close proximity to a preexisting dealer of the same brand. In fact, the public policy existing at that time favored robust competi-

---

[12] The criteria announced in the cigarette rule have been the subject of several scholarly articles. See Averitt, "The Meaning of 'Unfair Acts or Practices' in § 5 of the Federal Trade Commission Act," 70 Geo. L.J. 225 (1981); Craswell, "The Identification of Unfair Acts and Practices By the Federal Trade Commission," 1981 Wis. L. Rev. 107 (1981). Recently the commission was called upon to elaborate on these three criteria. See Letter from Federal Trade Commission to Senators Ford and Danforth (Dec. 17, 1980) (reprinted in Averitt, supra, 288).

[13] Public Acts 1982, No. 82-445, which the plaintiff maintains establishes a public policy opposed to Ford's conduct, had not been enacted at the time Ford began to seek a replacement for Bragg Motors. Nor has the plaintiff pointed to any common law policy that would prohibit Ford from taking the action it did. Absent any indication that the legislature was adopting a previously existing common law public policy when enacting Public Acts 1982, No. 82-445, its enactment does not support the plaintiff's contention that in 1980–1981 the public policy of the state was opposed to conduct similar to that of Ford's.

tion.[14] See General Statutes (Rev. to 1981) § 35-24 et seq. (The Connecticut Anti-Trust Act); *Elida, Inc.* v. *Harmor Realty Corporation,* 177 Conn. 218, 413 A.2d 1226 (1979). Ford's decision to grant Greentree a dealership did not contravene any public policy existing at that time.

McLaughlin has not disputed the finding of the court that Ford's conduct was not unethical or immoral and, therefore, it cannot satisfy the second criterion set out in the "cigarette rule." Nevertheless, McLaughlin maintains that the third criterion, substantial injury, has been met here, and that it alone is sufficient to establish an unfair trade practice.[15]

In discussing the third criterion, the federal trade commission has stated: "The independent nature of the consumer injury criterion does not mean that every consumer injury is legally 'unfair,' however. To justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have

---

[14] Public Acts 1982, No. 82-445 recognizes the need for intra-brand competition. The act does not guarantee an exclusive right to operate a dealership within a fourteen mile radius, but rather requires the commissioner of motor vehicles to demonstrate good cause, as defined in the statute, for denying the addition or relocation of a dealer in the objecting dealer's "relevant market area." See General Statutes § 42-133dd. Similarly, the federal Automobile Dealers Day in Court Act; 15 U.S.C. §§ 1221 through 1225; does not guarantee freedom from intra-brand competition. See *Southern Rambler Sales, Inc.* v. *American Motors Corporation,* 375 F.2d 932, 936 (5th Cir.), cert. denied, 389 U.S. 832, 88 S. Ct. 105, 19 L. Ed. 2d 92 (1967).

[15] The plaintiff relies principally upon the commission's statement that: "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." Statement of Basis and Purpose, Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures, 43 Fed. Reg. 59,614, 59,635 (1978).

avoided."[16] Letter from Federal Trade Commission to Senators Ford and Danforth (Dec. 17, 1980) (reprinted in Averitt, "The Meaning of 'Unfair Acts or Practices' in § 5 of the Federal Trade Commission Act," 70 Geo. L.J. 225, 291 [1981]). Although the commission was focusing upon substantial injury to consumers, one commentator has claimed that the test is equally applicable when a business person or competitor claims substantial injury. See Averitt, supra, 281–87. We agree. The substantial injury test, as set out by the federal trade commission, strikes the proper balance between the public need for vigorous competition, and the countervailing demand that the method of competition be fair. See *Murphy* v. *McNamara,* 36 Conn. Sup. 183, 188, 416 A.2d 170 (1979); see generally Costas, "Unfair Competition and Unfair Trade Practices — Transplants to the Unfair Trade Practices Act," 54 Conn. B.J. 405 (1980); note, "The Attack on Trading Stamps — An Expanded Use of § 5 of the Federal Trade Commission Act," 57 Geo. L.J. 1082 (1969).

In this case it is clear from the facts as found by the trial court that McLaughlin cannot meet the second prong of this three-prong test, because the court could reasonably have concluded that its loss was outweighed by continuing benefits to consumers arising from competition. The injury[17] McLaughlin will suffer is a loss

---

[16] For an example of application of this test see *All-State Industries of N.C., Inc.,* 75 F.T.C. 465 (1969), aff'd, 423 F.2d 423 (4th Cir.), cert. denied, 400 U.S. 828, 91 S. Ct. 57, 27 L. Ed. 2d 58 (1970) (requiring disclosure of what effect a transfer to a holder in due course of a negotiable instrument will have on the liability of the transferee for transferor's breach of contract); see generally Letter from Federal Trade Commission to Senators Ford and Danforth (Dec. 17, 1980) (reprinted in Averitt, "The Meaning of 'Unfair Acts or Practices' in § 5 of the Federal Trade Commission Act," 70 Geo. L.J. 225, 291–93 (1981).

[17] It is not at all clear that McLaughlin's injury is substantial. The trial court found that there "was evidence to negate the fears of the plaintiff that the appointment of a dealer in Brookfield will cause irreparable harm by forcing [McLaughlin] out of business."

of sales due to an increase in competition from an intra-brand competitor. This type of injury has traditionally been considered insignificant when compared to the benefit to consumers and for that reason statutes and common law permit only limited restriction of methods of competition. See *Elida, Inc.* v. *Harmor Realty Corporation,* supra, 231; see also *Scott* v. *General Iron & Welding Co.,* 171 Conn. 132, 368 A.2d 111 (1976); *Domurat* v. *Mazzaccoli,* 138 Conn. 327, 84 A.2d 271 (1951); Brodigan, "The Connecticut Antitrust Act," 47 Conn. B.J. 12 (1973). Increased competition alone, resulting from a practice containing none of the hallmarks of traditionally unfair practices, does not constitute a cause of action under CUTPA. McLaughlin has proven no more. It follows, therefore, that there was no error in denying relief on the second count.

There is no error.

In this opinion the other judges concurred.