## RONCARI DEVELOPMENT COMPANY *v.* GMG ENTERPRISES, INC., ET AL.

Superior Court      Judicial District of      File No. CV910394934
Hartford-New Britain at Hartford

Memorandum filed January 8, 1997

*Tyler, Cooper & Alcorn,* for the plaintiff.

*Nair & Levin,* for the named defendant et al.

*O'Connell, Flaherty, Attmore & Forsyth,* for the defendant Northeast Parking, Inc.

*Silver, Webb, Sweeney & Griffin,* for the defendant Northeast Parking, Inc., et al.

*Dwyer, Sheridan & Fitzgerald,* for the defendant Bradley Airport Valet Parking, Inc., et al.

No appearance for the defendants Joseph Scott Guilmartin and Bradley Air Parking Limited Partnership.

SHELDON, J. In this case, plaintiff Roncari Development Company (Roncari), has sued seven defendants,[1] all persons or entities allegedly involved in the airport valet parking business in and around Bradley International Airport (Bradley Airport) from 1987 or earlier, until the date this case was commenced.[2] The plaintiff

---

[1] The defendants include: GMG Enterprises, Inc., doing business as Airport Valet Parking (GMG); GMG's vice president, Robert A. Gosselin; Bradley Air Parking Limited Partnership (BAP/LP); Northeast Parking, Inc., doing business as V.I.P. Valet Parking (Northeast); Joseph Scott Guilmartin, the managing general partner of GMG and the president of Northeast; Bradley Airport Valet Parking, Inc. (BAVP); and BAVP's president, Guy Piccolo.

[2] This case was commenced by the service of process on or about May 14, 1991, with a return date of May 28, 1991.

seeks money damages and injunctive relief in connection with and as a result of the defendants' joint and concerted efforts, pursuant to a conspiracy to monopolize, restrict and/or prevent competition, and/or control prices in the local airport valet parking market to prevent the plaintiff from entering and competing in that market since 1989. In its four count revised complaint, the plaintiff alleges, more particularly, that the defendants pursued their anti-competitive design by jointly filing, maintaining and supporting by false and misleading testimony a groundless administrative appeal from the July 10, 1989 approval by the town of Windsor Locks zoning board of appeals (ZBA), of the plaintiff's application for a permit to construct a 2500 car valet parking facility on its thirty-two acre property directly across the road from Bradley Airport. As a result of the defendants' prosecution of their appeal, which the plaintiff has characterized as a "sham," the plaintiff claims that it has been delayed, hindered and/or prevented from using its property as an airport valet parking facility in competition with the defendants, lost income that would have derived from such use, and it incurred substantial costs, including attorney's fees, in opposing the appeal and otherwise protecting its interests.

The first and second counts of the revised complaint allege that the defendants engaged in the above described conduct in violation of the Connecticut Antitrust Act, General Statutes § 35-24 et seq. The third count, which incorporates by reference all the allegations of the first two counts, alleges that the defendants' conduct constituted unfair methods of competition and/or unfair or deceptive acts or practices in the conduct of trade or business, in violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. In this count, the plaintiff seeks both money damages for all losses allegedly caused by the

defendants' conduct and injunctive relief to prevent the continuation and/or future repetition of such conduct. The fourth and final count of the revised complaint, which repeats all of the substantive allegations of the first three counts, claims that the defendants' joint and concerted efforts to prevent it from entering the airport valet parking market tortiously interfered with a reasonable business expectancy it has had ever since the ZBA approved its application to construct a valet parking facility on its property in July, 1989. In this count, like the third count, the plaintiff seeks both money damages and injunctive relief.

The defendants have now moved to strike the plaintiff's revised complaint on the following grounds: first, that all of the plaintiff's claims are based upon conduct that is constitutionally protected by the first and fourteenth amendments to the United States constitution and by analogous provisions of the constitution of Connecticut, to wit: the filing and prosecution of a non-sham lawsuit in the legitimate exercise of the defendants' legal rights; second, that the plaintiff lacks standing to pursue its claims that the defendants violated the Connecticut Antitrust Act; third, that the plaintiff's CUTPA claim is legally insufficient because it is based upon a single act or course of conduct rather than a regular trade or business practice, it fails to allege that that act or course of conduct was engaged in the conduct of trade or commerce, and the plaintiff was not, at the time of such act or course of conduct, either a consumer or a competitor of the defendants in the relevant market.

I

A motion to strike contests the legal sufficiency of the allegations of the challenged pleading to state a claim upon which relief can be granted. Practice Book § 512; *Mingachos* v. *CBS, Inc.*, 196 Conn. 91, 108, 491

A.2d 368 (1985); *Ferryman* v. *Groton*, 212 Conn. 138, 142, 561 A.2d 432 (1989). "In ruling on a motion to strike, the court is limited to the facts alleged in the complaint." (Internal quotation marks omitted.) *Novametrix Medical Systems, Inc.* v. *BOC Group, Inc.*, 224 Conn. 210, 215, 618 A.2d 25 (1992). The court "must take the facts to be those alleged in the plaintiff's complaint and construe the complaint in the manner most favorable to sustaining its legal sufficiency." (Internal quotation marks omitted.) *Warner* v. *Konover*, 210 Conn. 150, 152, 553 A.2d 1138 (1989). A motion to strike admits all facts well pleaded. *Mingachos* v. *CBS, Inc.*, supra, 108. "If the facts provable under its allegations would support . . . a cause of action, [then] the motion to strike must fail." Id., 109. The challenged pleading is to be read broadly, "not strictly limited to the allegations, but also including the facts necessarily implied by and fairly provable under them." (Internal quotation marks omitted.) *Commercial Union Ins. Co.* v. *Frank Perrotti & Sons, Inc.*, 20 Conn. App. 253, 257, 566 A.2d 431 (1989) (citing *Schmidt* v. *Yardney Electric Corp.*, 4 Conn. App. 69, 74, 492 A.2d 512 (1985)).

## II

The defendants first claim that all counts of the revised complaint must be stricken because they are based, in their essence, on the filing and prosecution of a non-sham lawsuit in the legitimate exercise of their legal rights. Such conduct, note the defendants, is constitutionally protected from federal antitrust actions by the first amendment to the United States constitution, as interpreted and applied under the so-called *Noerr-Pennington* doctrine. Therefore, they argue, it must similarly be protected from state antitrust and other statutory and common-law actions under the first and fourteenth amendments to the United States constitution and analogous provisions of the constitution of Connecticut.

The plaintiff does not strenuously argue against the applicability of the *Noerr-Pennington* doctrine to state statutory and common-law damages actions. Rather, it argues principally that each count of its revised complaint states a valid claim for relief that may constitutionally be pursued under the sham litigation exception to *Noerr-Pennington.* For the following reasons, this court agrees with the plaintiff that this portion of the defendants' challenge to the revised complaint must be rejected.

The *Noerr-Pennington* doctrine, evolving from a trilogy of United States Supreme Court decisions; *Eastern Railroad Presidents Conference* v. *Noerr Motor Freight,* 365 U.S. 127, 81 S. Ct. 523, 5 L. Ed. 2d 464, reh. denied, 365 U.S. 875, 81 S. Ct. 899, 5 L. Ed. 2d 864 (1961); *United Mine Workers* v. *Pennington,* 381 U.S. 657, 85 S. Ct. 1585, 14 L. Ed. 2d 626 (1965); *California Motor Transport Co.* v. *Trucking Unlimited,* 404 U.S. 508, 92 S. Ct. 609, 30 L. Ed. 2d 642 (1972); "shields from the Sherman [Antitrust] Act a concerted effort to influence public officials regardless of intent or purpose." *United Mine Workers* v. *Pennington,* supra, 670. As the court noted in *California Motor Transport,* "it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis a vis their competitors." *California Motor Transport Co.* v. *Trucking Unlimited,* supra, 510–11.

Even so, it is generally recognized that there may be situations where the combination of parties to assert legal claims "is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." *Eastern*

*Railroad Presidents Conference* v. *Noerr Motor Freight*, supra, 365 U.S. 144. In those situations, the *Noerr-Pennington* doctrine affords the colluding parties no protection from federal antitrust laws.

In this case, the plaintiff brought claims under the Connecticut Antitrust Act, CUTPA and Connecticut common law. Although no Connecticut Supreme or Appellate Court decision has applied the *Noerr-Pennington* doctrine to Connecticut antitrust law, the doctrine has gained wide acceptance in the decisions of this court. See *Connecticut National Bank* v. *Mase*, judicial district of Fairfield at Bridgeport, Docket Number 269180 (January 31, 1991, *Flynn, J.*); *Abrams* v. *Knowles*, Superior Court, judicial district of Norwich, Docket No. 95287 (December 4, 1990) (3 Conn. L. Rptr. 13) (*Axelrod, J.*); *Yale University School of Medicine* v. *Wurtzel*, Superior Court, judicial district of New Haven, Docket Number 275314 (November 9, 1990, *Flanagan, J.*). Moreover, the Second Circuit Court of Appeals has concluded that our Supreme and Appellate Courts will very probably adopt *Noerr-Pennington* and the sham lawsuit exemption thereto when presented with the opportunity to do so: "We believe that Connecticut's courts would be guided by the strong suggestions from the federal courts that imposing liability for the act of filing a non-sham lawsuit would present serious constitutional problems, and would construe Connecticut law to avoid those problems. Especially since *Noerr-Pennington*'s statutory exemption is defined in terms of first amendment activity, we are confident that Connecticut's courts would carve out a similar exception to CUTPA and the common law, whether or not they believed that they were required to do so by the Constitution." *Suburban Restoration Co., Inc.* v. *ACMAT Corp.*, 700 F.2d 98, 102 (2d Cir. 1983).

This court agrees. Since article first, § 10, of the constitution of Connecticut provides that "[a]ll courts shall

be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay," the public policy of this state strongly supports the adoption of the *Noerr-Pennington* doctrine.

Until recently, there was considerable uncertainty as to what constitutes "sham litigation" for the purposes of the *Noerr-Pennington* doctrine.[3] Some feared, in particular, that the term "sham" might become "no more than a label courts could apply to activity they deem unworthy of antitrust immunity." *Professional Real Estate Investors, Inc.* v. *Columbia Pictures Industries, Inc.*, 508 U.S. 49, 55, 113 S. Ct. 1920, 123 L. Ed. 2d 611 (1993), quoting *Allied Tube & Conduit Corp.* v. *Indian Head, Inc.*, 486 U.S. 492, 508 n.10, 108 S. Ct. 1931, 100 L. Ed. 2d 497 (1988). In 1993, however, with its decision in *Professional Real Estate Investors*, the United States Supreme Court resolved this issue by holding that "an objectively reasonable effort to litigate cannot be sham regardless of subjective intent." *Professional Real Estate Investors, Inc.* v. *Columbia Pictures Industries, Inc.*, supra, 57. The court outlined a new test, as follows: "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated

---

[3] Thus, for example, it has been held: that an alleged sham must be proved legally, unreasonable; *McGuire Oil Co.* v. *Mapco, Inc.*, 958 F.2d 1552, 1560 (11th Cir. 1992); that litigation with genuine legal substance raises merely a rebuttable presumption of immunity; *Westmac, Inc.* v. *Smith*, 797 F.2d 313, 318 (6th Cir. 1986); that immunity should be denied, even in the pursuit of valid claims, if "the stakes, discounted by the probability of winning, would be too low to repay the investment in litigation;" *Grip-Pak, Inc.* v. *Illinois Tool Works, Inc.*, 694 F.2d 466, 472 (7th Cir. 1982); and that "success on the merits does not . . . preclude" proof of a sham if the litigation was not "significantly motivated by a genuine desire for judicial relief . . . ." (Internal quotation marks omitted.) *In re Burlington Northern, Inc.*, 822 F.2d 518, 528 (5th Cir. 1987).

to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. . . . This two-tiered process requires the plaintiff to disprove the challenged lawsuit's *legal* viability before the court will entertain evidence of the suit's *economic* viability." (Emphasis in original.) Id., 60. Under the new test, "evidence of anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham." Id., 59. To satisfy the first prong of the *Professional Real Estate Investors* test, the plaintiff must plead facts which would support a claim that the litigation is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." Id., 60. In the case at bar, the plaintiff alleges that the defendants violated the Connecticut Antitrust Act by "commencing, maintaining, and actively participating in the appeal without a reasonable basis in fact and in law for their claims of aggrievement . . . for their claims that the Zoning Board of Appeals acted illegally . . . for the purpose of preventing, delaying, or hindering competition during the pendency of the appeal without a reasonable expectation that they would utlimately prevail on the merits . . . ." The language of this paragraph of the plaintiff's complaint is virtually identical to the language in *Professional Real Estate Investors*, outlining and explaining the "objectively unreasonable" test. The plaintiff will, of course, bear the burden of proving its allegations at trial. At this stage, however, nothing more is required.

The defendants claim, however, that even if the first prong of the test is satisfied, the second prong is not. "Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit

conceals 'an attempt to interfere directly with the business relationships of a competitor;' [*Eastern Railroad Presidents Conference* v. *Noerr Motor Freight,* supra, 365 U.S. 144;] through the 'use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon. . . .' [(Emphasis in original.) *Columbia* v. *Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 378, 111 S. Ct. 1344, 113 L. Ed. 2d 382 (1991).]" *Professional Real Estate Investors, Inc.* v. *Columbia Pictures Industries, Inc.,* supra, 508 U.S. 60–61. Essentially, then, "[a] sham situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all . . . ." (Internal quotation marks omitted.) *Columbia* v. *Omni Outdoor Advertising, Inc.,* supra, 380.

In the present case, the plaintiff has alleged that "[t]he defendants combined, conspired, and colluded with each other . . . to monopolize, restrict and/or prevent competition in the market for valet parking, to prevent entry into the market and/or to control the price, service and availability of valet parking . . . in restraint of trade through . . . (a) meeting together, actively participating in, and jointly hiring counsel to commence, continue and maintain lawsuits . . . which lawsuits were designed and intended to delay or prevent new competitors from entering the valet parking market . . . (b) presenting false and misleading testimony and pleadings in the lawsuits . . . (c) filing the lawsuits under assumed or fictitious names . . . ." Nothing else is needed. In fact, these allegations, if proven, describe the classic situation envisioned by the United States Supreme Court as typifying abuse of the legal process—"the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay." Id., 380. The plaintiff has therefore

alleged facts sufficient to satisfy the second prong of the *Professional Real Estate Investors* test.

Because the plaintiff has alleged facts which, if proved, would show that the defendant's appeal was objectively baseless and concealed an attempt to interfere directly with the plaintiff's business relationships, this portion of the defendant's motion to strike is denied.

### III

The defendants next challenge the legal sufficiency of the first and second counts of the plaintiff's revised complaint, contending that on the facts therein alleged, the plaintiff lacks standing to sue for treble damages under the Connecticut Antitrust Act. They claim, in particular, that since the plaintiff, by its own allegation and resulting judicial admission, was not engaged in the airport valet parking business at the time of their alleged conspiracy, combination and joint and concerted actions to monopolize, restrain trade, prevent competition and/or control prices in the relevant market, it could not have suffered the kind of competitive injury that the Connecticut Antitrust Act was designed to prevent.

The right to bring a treble damages action for alleged violation of the Connecticut Antitrust Act arises under General Statutes § 35-35, which provides that "[t]he state, or any person, including, but not limited to, a consumer, injured in its business or property by any violation of the provisions of this chapter shall recover treble damages, together with a reasonable attorney's fee and costs." To plead a sufficient cause of action under this section, a plaintiff must obviously allege *both* that the defendants engaged in at least one "violation of the provisions of this chapter"—i.e., of the Connecticut Antitrust Act, which is codified at chapter 624 of the General Statutes—*and* that the plaintiff is a "person

. . . injured in its business or property by [said] viola-
tion . . . ." General Statutes § 35-35.

In this case, the plaintiff has clearly alleged that the
defendants, by their conduct, violated several substan-
tive provisions of the Connecticut Antitrust Act. In par-
ticular, the plaintiff's allegations of conspiracy,
combination, and joint and concerted efforts to monop-
olize, restrain trade, prevent competition, and/or con-
trol prices in the local valet parking market would,
if proved at trial, establish violations of the following
substantive provisions of the Connecticut Antitrust Act:
General Statutes § 35-26, which provides that "[e]very
contract, combination, or conspiracy in restraint of any
part of trade or commerce is unlawful[;]" General Stat-
utes § 35-27, which provides that "[e]very contract,
combination, or conspiracy to monopolize, or attempt
to monopolize, or monopolization of any part of trade
or commerce is unlawful[;]" and General Statutes § 35-
28, which provides in relevant part that, "[w]ithout lim-
iting section 35-26, every contract, combination, or con-
spiracy is unlawful when the same are for the purpose,
or have the effect, of: (a) Fixing, controlling, or main-
taining prices, rates, quotations, or fees in any part of
trade or commerce; [or] (b) fixing, controlling, main-
taining, [or] limiting . . . the . . . supply of any part
of trade or commerce . . . ."

Accordingly, the defendants have focused their chal-
lenge on the second essential requirement of § 35-35:
that the plaintiff be a "person . . . injured in its busi-
ness or property by [the antitrust] violation[s]" alleged
in its revised complaint. The defendants' claim, to
restate it, is that the plaintiff could not, as a matter of
law, have suffered an actionable antitrust injury
because, at the time of the defendants' alleged conspir-
acy, combination and joint and concerted efforts to
monopolize, restrain trade, prevent competition and/or

control prices in the local airport valet parking market, the plaintiff did not compete in that market.

If the statutory phrase, "any person injured in its business or property by any violation of the provisions of this chapter," were given a literal interpretation, the statute would plainly be broad enough to confer standing to bring a treble damages action upon every person who ever sustained any kind of pecuniary loss or injury that could be traced, however remotely or indirectly, to a proven violation of the Connecticut Antitrust Act. In that event, the first and second counts of the plaintiff's revised complaint would surely state valid claims under § 35-35, for it explicitly alleges that as a result of the defendants' monopolistic and otherwise anticompetitive conduct, the plaintiff was unable to make profitable use of its Windsor Locks property as an airport valet parking facility, it lost profits that would have come from such use, and it has been forced to expend monies to protect its legal rights in response to the defendants' actions.

It has long been understood, however, that since the Connecticut Antitrust Act is based upon the federal antitrust laws, its provisions must ordinarily be construed in light of binding federal precedents interpreting and applying parallel provisions of federal law. *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 15–16, 664 A.2d 719 (1995) (observing that since "[t]he legislative history of the act clearly establishes that it was intentionally patterned after the antitrust law of the federal government . . . we follow federal precedent when we interpret the act unless the text of our antitrust statutes, or other pertinent state law, requires us to interpret it differently)."[4] (Citations

---

[4] Recently, this rule of construction was explicitly incorporated into the Connecticut Antitrust Act by the passage of Public Acts 1992, No. 92-248, which is now codified at General Statutes § 35-44b. Section 35-44b provides as follows: "It is the intent of the General Assembly that in construing

omitted.) Therefore, this court cannot construe § 35-35 until it has examined and considered federal case law interpreting and applying its functionally identical federal counterpart—the federal treble damages statute, which was enacted as § 4 of the Clayton Antitrust Act (Clayton Act) and is now codified at 15 U.S.C. § 15. See generally *Douglas* v. *Hospital of St. Raphael*, 33 Conn. Sup. 215, 219–25 (1976). Section 4 of the Clayton Act provides as follows: "Any person who shall be injured in his business or property by reason of anything forbidden in the [federal] antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee . . . ." 15 U.S.C. § 15 (a). Prior to 1984, the lower federal courts had unanimously shared the view that this statute should be read more narrowly than its broad, all-encompassing language might suggest. In particular, they were concerned that unless the statutory treble damages remedy were restricted to persons or entities whose losses were proximately or legally caused by antitrust violations, courts would be clogged with a surfeit of speculative damages claims by those whom Congress never sought to protect by the federal antitrust laws, and whose prosecution of such claims would actually frustrate private antitrust enforcement efforts by unnecessarily complicating more meritorious actions with complicated allocation of damages questions. See generally annot., "Target Area" doctrine as basis for determining standing to sue under § 4 of Clayton Act (15 U.S.C. § 15) allowing treble damages for violation of antitrust laws, 70 A.L.R. Fed. 637, 642–45 (1984).

sections 35-24 to 35-46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes."

There was considerable disagreement among the federal circuits, however, as to how cases falling within the statute should be distinguished from cases falling outside it. Id. "Some courts have focused on the directness of the injury[.] . . . Others have applied the requirement that the plaintiff must be in the 'target area' of the antitrust conspiracy, that is, the area of the economy which is endangered by a breakdown of competitive conditions in a particular industry. . . . Another Court of Appeals . . . asked whether the injury is 'arguably within the zone of interests protected by the antitrust laws.' " (Citations omitted.) *Associated General Contractors* v. *Carpenters*, 459 U.S. 519, 536 n.33, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983).

In *Associated General Contractors*, where it first formally addressed this issue, the United States Supreme Court agreed with the lower courts that a literal reading of the statute was inappropriate because such a reading would be inconsistent with the intent of Congress, as evidenced by the statute's legislative history. Thus, though it acknowledged that the statute's language, like that of § 35-35, "is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation;" id., 529; it concluded that that language must be read more restrictively in light of established common-law principles, including the doctrines of foreseeability and proximate cause, directness of injury and certainty of damages, which the statute's framers expected courts to apply when construing it. Id., 532–33.

As it did so, however, the court declined to adopt any particular test for deciding which cases are covered by the statute and which are excluded from it. Instead, it declared that lower federal courts must analyze each case individually, evaluating "the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them;" id., 535; and deciding whether the

law affords a remedy in the circumstances presented, in light of factors bearing appropriately on that issue, as identified in previously decided cases. Id., 537. The court then went on, instructively, to identify and apply several "factors [affecting] judicial recognition of the [plaintiff's] antitrust claims" to the allegations in the case before it. Id.

The first factor so identified and applied, though not dispositive of the plaintiff's right of action, was the alleged "causal connection between an antitrust violation and harm to the [plaintiff.]" Id. The second, which was also not dispositive, was the plaintiff's claim that "the defendants intended to cause [the particular] harm." Id.

A third factor, one which the court said "may be controlling;" id., 538; was "the nature of the plaintiff's alleged injury." Id. On that score, the court made the following significant observations: "As the legislative history shows, the Sherman [Antitrust] Act[, 15 U.S.C. § 1 et seq.,] was enacted to assure customers the benefits of price competition, and our prior cases have emphasized the central interest in protecting the economic freedom of participants in the relevant market. Last term in *Blue Shield of Virginia* v. *McCready*, [457 U.S. 465, 102 S. Ct. 2540, 73 L. Ed. 2d 149 (1982)], we identified the relevance of this central policy to a determination of the plaintiff's right to maintain an action under § 4. McCready alleged that she was a consumer of psychotherapeutic services and that she had been injured by the defendants' conspiracy to restrain competition in the market for such services. The Court stressed the fact that 'McCready's injury was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws.' 457 U.S., at 483, citing *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487–89, [97 S. Ct. 690, 50 L. Ed. 2d 701] (1977). After noting that her injury 'was inextricably

intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market.' 457 U.S., at 484, the Court concluded that such an injury 'falls squarely within the area of congressional concern.' Ibid." *Associated General Contractors* v. *Carpenters*, supra, 459 U.S. 538. So stating, the court went on to hold that in the case before it, the nature of the alleged injury was not a factor which favored the plaintiff, because the plaintiff was a labor union, whose interests as a bargaining representative for its members, unlike those of "a consumer [or] a competitor in the market in which trade was restrained;" id., 539; were not the sort of interests which the Sherman Antitrust Act was designed to protect. A final important factor identified by the court was "the directness or indirectness of the asserted injury." Id., 540. In the case before it, said the court, this factor worked against the plaintiff union because "the chain of causation between the Union's injury and the alleged restraint in the [relevant] market . . . contains several somewhat vaguely defined links. According to the complaint, defendants applied coercion against certain landowners and other contracting parties in order to cause them to divert business from certain union contractors to nonunion contractors. As a result, the Union's complaint alleges, the Union suffered unspecified injuries in its 'business activities.' It is obvious that any such injuries were only an indirect result of whatever harm may have been suffered by 'certain' construction contractors and subcontractors.

"If either these firms, or the immediate victims of coercion by defendants, have been injured by an antitrust violation, their injuries would be direct and, as we held in *McCready*, they would have a right to maintain their own treble-damages actions against the defendants. An action on their behalf would encounter none of the conceptual difficulties that encumber the Union's claim. The existence of an identifiable class of persons

whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as the Union to perform the office of a private attorney general. Denying the Union a remedy on the basis of its allegations in this case is not likely to leave a significant antitrust violation undetected or unremedied." Id., 540–42. The court concluded its remarks on the directness or indirectness of the plaintiff's alleged injury by noting that if the right to bring treble damages actions were appropriately limited to those directly injured by the defendants' anticompetitive activity, speculative damages claims would be avoided, the risk of duplicate recoveries would be lessened, and the scope of already complex antitrust cases would be maintained within manageable judicial limits by eliminating complex apportionment of damages issues. Id., 542–44.

The defendants in the instant case would have this court rule that since the plaintiff had not yet entered the airport valet parking business by the time of their alleged conspiracy, combination and joint and concerted actions to prevent him from doing so, the plaintiff has not suffered the sort of competitive injury which the antitrust laws, state and federal, were designed to prevent. Employing the analysis used by the United States Supreme Court in *Associated General Contractors*, however, the defendants' claim must be rejected.

To begin with, as previously noted, the plaintiff has clearly alleged a causal link between the defendants' alleged antitrust violations and the losses for which it seeks treble damages in this case. It has claimed, moreover, that it was the direct and intended victim of the defendants' anticompetitive activities, for the alleged purpose and effect of the defendants' challenged administrative appeal was to overturn the board's approval of its building permit application, and thus to

delay, hinder or prevent its immediate entry into the local airport valet parking market.[5] These factors, all identified, described, and relied upon to determine antitrust standing under the Clayton Act by the United States Supreme Court, strongly favor the viability of the plaintiff's treble damages action under § 35-35.

It is true, of course, that the plaintiff had not yet become a competitor in the relevant market when the defendants' alleged conspiracy, combination and joint and concerted actions to prevent it from entering that market took place. Even so, both the nature of the defendants' challenged conduct and the nature of the plaintiff's alleged injury strongly support the plaintiff's claim that it has standing to pursue this action. When an antitrust plaintiff is already a competitor of the antitrust defendants in the market they seek to monopolize and control, any alleged injury to its ability to compete in that market is the classic sort of injury for which a treble damages claim under the antitrust laws may be pursued. Such a competitor is the direct and foreseeable target of the defendants' conduct, its injuries are immediate and far from speculative, and the presentation of its claim presents no risk of duplicate recoveries or complex apportionment of damages issues.

When, by contrast, an antitrust plaintiff has not yet entered the relevant market, more difficult questions naturally arise as to whether he has truly suffered any injury, much less an injury to his ability to compete in that market, which the antitrust laws were enacted to

---

[5] At least one of the defendants has argued that the plaintiff could not have been delayed, hindered or prevented from entering the airport valet parking business by the bringing and maintaining of the subject administrative appeal because the pendency of that appeal did not operate to stay the ZBA's approval of the plaintiff's building permit, or thus to prevent the construction and opening for business of the planned valet parking facility. Because this argument requires proof of facts outside the allegations of the revised complaint, it cannot be considered a proper basis for striking that pleading.

protect. If a plaintiff only contemplated entering the relevant market before the antitrust violation occurred, his claim of competitive injury, like his business plans themselves, is merely speculative, and thus is not the proper subject of a treble damages action. If, on the other hand, a plaintiff with well-developed plans, available means and a definite intention to make immediate entry into that market is prevented from so doing by the anticompetitive conduct of the defendants, then it, no less than those already competing with the defendants in the market, is the very sort of person who is classically entitled to bring a statutory treble damages action. See generally 54 Am. Jur. 2d 430, Monopolies and Restraints of Trade § 414 (1996) ("Prospective competitors, as well as current competitors, may have standing to bring an action alleging a conspiracy to restrain trade or other antitrust violation, if such would-be competitors are able to demonstrate both an intention and a preparedness to enter the relevant market.")

When a potential competitor brings an antitrust action, the court's task is to distinguish between a serious potential competitor who has illegally been kept out of the market and the inchoate business enterprise with a mere hope of entry. *Practice Perfect, Inc.* v. *Hampton County Pharmaceutical Ass'n*, 732 F. Sup. 798, 802 (S.D. Ohio 1990). A prospective participant in the market suffers an antitrust injury if it has taken substantial and demonstrable steps to enter an industry but has been thwarted in that purpose by an antitrust violation. *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 11 F.3d 1460, 1464–65 (9th Cir. 1993).

In this case, the plaintiff alleges that over a period of four years it made efforts to secure the approval of Windsor Locks zoning authorities for the construction of a valet parking facility on its property across from Bradley Airport. Having finally secured the necessary

permit, it alleges that it was prepared to construct the planned facility at once so that it could open its airport valet parking business by December, 1989. According to the plaintiff, the defendants' filing and prosecution of their sham administrative appeal injured it directly and substantially by delaying, hindering and preventing it from proceeding at once with the long planned construction of its new facility and the opening of its new valet parking business. Because these allegations, if proved at trial, would clearly establish both that the defendant was a serious potential competitor of the defendants in the market they sought to monopolize and control, and that the plaintiff had taken substantial and demonstrable steps to enter that market before it was thwarted in that purpose by the defendants' anticompetitive conduct, the court concludes that the plaintiff has standing to pursue that claim under § 35-35. Accordingly, this portion of the defendants' motion to strike is also denied.

IV

The defendants' final challenge to the plaintiff's revised complaint is directed at the third count of that pleading, which alleges, inter alia, that by filing and prosecuting their sham appeal from the ZBA's approval of the plaintiff's building permit application, and thereby preventing, hindering and/or delaying the plaintiff's entry into the local airport valet parking market pursuant to a conspiracy to monopolize, restrain trade, prevent competition and/or control prices in that market, the defendants violated CUTPA. The defendants have advanced a number of related reasons why their conduct, as alleged in the revised complaint, cannot be found to constitute an actionable violation of CUTPA. For the following reasons, the court concludes that this final aspect of the defendants' motion to strike must also be denied.

The defendants first claim that the doing of a single act, of whatever kind or for whatever reason, can never constitute a violation of CUTPA because the substantive proscription of unfair trade practices set forth therein is worded in the plural, as follows: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or business." General Statutes § 42-110b (a). (Emphasis added.) There are two important reasons why this frequently proffered argument must be rejected.

First, the General Assembly has long made it clear that singular and plural usages in state statutes may be used interchangeably where the broader statutory context supports such a reading. On this precise point, General Statutes § 1-1 (f) provides: "Words importing the singular number may extend and be applied to several persons or things, and words importing the plural number may include the singular." It is true, of course, that "the legal principle set forth in § 1-1 (f) cannot be said to 'require' that singular and plural forms have interchangeable effects . . . ." *Winchester* v. *Connecticut State Board of Labor Relations*, 175 Conn. 349, 361, 402 A.2d 332 (1978). However, the principle is properly invoked and relied upon where the legislature's intent to give singular meanings to plural terms or plural meanings to singular terms is otherwise evidenced by the text or history of the relevant statute. Id.

Though the language of § 42-110b (a) unquestionably describes substantive violations of CUTPA in the plural, it does not, on its face, purport to require proof of multiple acts, practices or methods of competition to establish a CUTPA violation. As it is the purpose of this remedial statute to protect consumers, competitors and other business people from *all* kinds of unfair trade practices, without limitation, it surely takes no leap of logic to infer that the legslature meant to prohibit *every* such act, practice or method of competition, if ever and

whenever it occurred. A contrary reading of the statute would effectively afford immunity from CUTPA enforcement to any person whose unfair or deceptive act, practice or method of competition, however harmful to the rights and interest of others, cannot be shown to have happened more than once.

In fact, the broader context of CUTPA makes it clear that each and every unfair method of competition, as well as each and every unfair or deceptive act or practice, is separately actionable as a violation of CUTPA by any person who suffers an ascertainable loss by reason thereof. General Statutes § 42-110g, which establishes the right to bring an action for money damages under CUTPA, describes the conduct necessary to recover such damages in the singular as follows: "Any person who suffers any ascertainable loss of money or property, real or personal, *as a result of the use or employment of a method, act or practice prohibited* by section 42-110b, may bring an action . . . to recover actual damages." (Emphasis added.) The singular usage in the previously quoted statute leaves nothing to the imagination as to the conduct which is prohibited by § 42-110b. It makes plain that the plural language of § 42-110b prohibits single, as well as multiple or repeated acts, practices and methods of competition. It also clearly establishes that each such act, practice and method of competition affords a proper basis for a damages action under CUTPA. For these reasons, the defendants' initial challenge to the third count of the plaintiff's revised complaint must be rejected.

The defendants next claim that even if a single act can constitute a violation of CUTPA, the act of filing and maintaining a lawsuit—even one that meets the sham litigation exception to the *Noerr-Pennington* doctrine, and thus qualifies as a violation of the antitrust laws—does not violate CUTPA where, as here, none of the defendants filed the lawsuit "in the conduct of any

trade or commerce." General Statutes § 42-110b. For the following reasons, this court disagrees.

Section 42-110b provides in pertinent part that:

"(a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

"(b) It is the intent of the legislature that in construing subsection (a) of this section, the . . . courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5 (a) (1) of the Federal Trade Commission Act (15 U.S.C. 45 (a) (1)), as from time to time amended."

Following the mandate of § 42-110a, Connecticut courts have "adopted the criteria set out in the 'cigarette rule' by the federal trade commission for determining when a practice is unfair: '(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise— whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)].' *Conaway* v. *Prestia*, [191 Conn. 484, 492–94, 464 A.2d 847 (1983),] quoting *FTC* v. *Sperry & Hutchinson Co.*, 405 U.S. 233, 244–45 n.5, 92 S. Ct. 898, 31 L. Ed. 2d 170 (1972). . . ." *McLaughlin Ford, Inc.* v. *Ford Motor Co.*, 192 Conn. 558, 567–68, 473 A.2d 1185 (1984).

Applying these criteria to the act of prosecuting a sham lawsuit to prevent, hinder or delay a prospective competitor from entering a market pursuant to a conspiracy to monopolize, restrain trade, prevent competition and/or to control prices in that market, the

following observations must be made. First, because such conduct directly violates the antitrust laws, state and federal, it clearly "offends public policy as . . . established by [those laws]." (Internal quotation marks omitted.) Id., 568. Secondly, such conduct is "oppressive [and] unscrupulous," for it subjects the plaintiff, a would-be competitor, both to the loss of a valuable business opportunity and to the potentially crippling expense of hiring counsel to overcome the defendants' dishonest, anticompetitive effort to extinguish it entirely. (Internal quotation marks omitted.) Id. Thirdly, the delay or prevention of the plaintiff's entry into the valet parking market with a large new facility that could potentially serve a large percentage of that market very probably caused substantial injury not only to the plaintiff, but to the consuming public. Just as the plaintiff was disenabled from competing in the relevant market, customers in that market were deprived of the plaintiff's services and of the price and service benefits that would doubtless have been realized with increased competition. In short, the challenged conduct appears on its face to satisfy each prong of the cigarette rule.

Not suprisingly, the federal courts have long agreed with this position, holding that "the [federal trade] [c]ommission has broad powers to declare trade prices unfair[, and that this] broad power . . . is particularly well established with regard to trade practices which conflict with the basic policies of the Sherman and Clayton Acts even though such practices may not actually violate these laws." *FTC* v. *Brown Shoe Co.*, 384 U.S. 316, 320–21, 86 S. Ct. 1501, 16 L. Ed. 2d 587 (1966). Accordingly, in *FTC* v. *Motion Picture Advertising Co.*, 344 U.S. 392, 394–95, 73 S. Ct. 301, 97 L. Ed. 426 (1953), the United States Supreme Court declared that *"the Federal Trade Commission Act was designed to supplement and bolster the Sherman Act and the Clayton Act . . . to stop in their incipiency acts and practices*

which, when full blown, would violate those Acts . . . *as well as to condemn as 'unfair methods of competition' existing violations of them."* (Citations omitted; emphasis added.)

So stating, the court has clearly established that "[a] combination or conspiracy in restraint of trade is an unfair method of competition . . . ." 87 C.J.S. 649 Trade-Marks, Trade-Names, and Unfair Competition, § 228c (1954). It has also established that "[t]he standards established by the anti-trust acts, and by the courts in construing and applying such acts," are the standards to be applied in "determining whether particular acts amount to unfair methods of competition within the Federal Trade Commission Act, and in determining whether practices which are against public policy because of their dangerous tendency to hinder competition or create a monopoly constitute unfair methods of competition." Id., 649–50; accord 1 R. Langer, J. Morgan & D. Belt, Connecticut Unfair Trade Practices Act (1994) § 2.4, p. 23 ("When first enacted, the Federal Trade Commission Act prohibited only unfair methods of competition. The provision now is understood to cover anticompetitive conduct of essentially the same character as the Sherman Act and the Clayton Act. The Connecticut Antitrust Act covers the same subject matter . . . .")

Here, then, since this court has already ruled that the allegations of the plaintiff's antitrust counts, all of which are incorporated by reference in its CUTPA count, are sufficient to plead an actionable violation of the Connecticut Antitrust Act within the sham litigation exception to the *Noerr-Pennington* doctrine, the court concludes that it has also adequately pleaded a violation of CUTPA.

The defendants' final challenge to the third count of the plaintiff's revised complaint is that the plaintiff is

not entitled to make a CUTPA claim since it was not a consumer or a competitor of the defendants when they filed the challenged administrative appeal. This argument is easily disposed of on two independent bases. First, in *McLaughlin Ford*, our Supreme Court explicitly held that to prove a violation of CUTPA, a plaintiff need not show that he suffered consumer injury. Instead, said the court, "[w]e agree with the plaintiff that a competitor *or other business person* can maintain a CUTPA cause of action. . . ." (Emphasis added.) *McLaughlin Ford, Inc.* v. *Ford Motor Co.*, supra, 192 Conn. 567. Since the plaintiff in this action, though only a serious potential competitor of the defendants in the airport valet parking market, was clearly another "business person," it is entitled to present its claim for relief under CUTPA.

Second, as previously noted, since the plaintiff has already been determined by this court to have standing, as a potential competitor of the defendants, to file and maintain an antitrust claim against them, then it likewise has a right to present a CUTPA claim against them. To reiterate a point just made: the standards applicable to antitrust claims govern those applicable to similar conduct under the Federal Trade Commission Act, and thus, by extension, under CUTPA.

## CONCLUSION

For all of the foregoing reasons, each and every claim presented by the defendants in their pending motions to strike is hereby denied.