[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff Chase Orchards, LLC, is a developer and builder of a residential real estate development in South Windsor. For purposes of this case, the principal member of the LLC is John Doran. This action involves a dispute with Gerber Construction, Inc., whose principal officer is Ron Gerber. The court trial spanned six hearing days in March, 2002, and the last brief was filed on May 3, 2002. In August, when the decision was being written, the plaintiff alleged in a motion that certain testimony, which had been accepted as factually accurate by both CT Page 10496 sides, was in fact erroneous. I allowed brief additional testimony on August 20, 2002.
Doran had in the mid-1990's developed another subdivision, Chase Farms, which consisted of seventeen homes. Toward the end of the work at Chase Farms Doran hired Gerber[1] to perform excavation work on approximately ten lots, and there were no problems with that work.
Chase Orchards was a more ambitious project. The project was built on approximately sixty acres in South Windsor near the town line with Vernon. Doran received subdivision approval for 51 residential lots. Much of the land was on a hill which contained significant ledge rock, and therein lies the rub. Most, but not all, of the dispute in this action concerns the costs of and charges for the removal of rock and associated activities.
In October, 1997, Doran sent invitations to bid on the site construction work to three subcontractors, including Gerber. The "request for bid" listed the work to be performed. It included clearing the land, installation of erosion controls, "cuts fills", "trucking if required", sanitary and storm sewer installation, trenches for various utilities, grading, paving, water mains and more. The request specified that the bid "shall include all work including labor and materials, required to complete the subdivision improvements as shown on plans prepared by (the engineering firm)." The request for bid further provided that the "contractor shall provide a cost for trench rock and mass rock removal per cubic yard. If rock is encountered the contractor shall be responsible to uncover rock required for removal and the owner shall, at no expense to the contractor, have his surveyor cross section the rock to be removed."
Gerber responded to the request to bid by submitting separate proposals for Phase I and Phase II. The amount of the proposal for Phase I initially was $904,700.00; for Phase II it was $519,067.000. After some discussion, the signed contract for Phase I was for the amount of $751,355.00; this contract was signed in August, 1998, and incorporated three change orders that had already been authorized. There never was a final, signed version of the Phase II agreement, but after some items were excluded from the proposal because Doran thought he could do better by independently contracting with someone else for those items, the final amount was approximately $350,000.00.
From the beginning of the negotiating process, everyone knew that blasting of rock would be required and it was apparent that the amount of rock was significant. Some ledge rock could be seen at the surface. Before virtually any work was done, Doran asked an employee to dig a CT Page 10497 number of test holes roughly in the center of the future roadway to determine the depth of the rock: the shallower the hole before one reached rock, the more rock would have to be removed. The request to bid and the various proposals submitted by Gerber specifically exclude blasting itself. Indeed, Gerber apparently suggested that the blasting be done by Ravizza Brothers, and Doran then contracted directly with Ravizza for those services. Gerber arranged for Botticello, Inc., to crush rock on the premises and negotiated with Doran a price per yard for crushing, which was paid by Doran to Gerber.
One of the primary subjects in dispute is who was responsible for the trucking of blasted rock. Once rock was blasted, from the roadway, trenches and, later, individual lots, the blasted rock had to be transported to a rock crusher, which was installed on site, and the resulting product had to be transported as well, either for use as fill or gravel on other parts of the development or to be disposed off site. Because of the massive amounts of rock involved, the trucking cost was considerable. Both principal parties testified about the contractual arrangement for the cost of trucking, and the testimony was diametrically opposed.
Doran testified that in a meeting shortly after Gerber submitted his bid proposals the issue came up. During that meeting, Doran took some notes on a copy of the request for bid which he had prepared, and that copy was introduced into evidence (Exhibit 2). Included in the bid was the item "trucking if required"; on the request to bid, this item appeared directly beneath the item "cuts fills". Next to "trucking if required", Doran wrote "in cuts fills". Doran testified that this note memorialized for him the understanding he had reached with Gerber that the cost for all trucking, including hauling blasted rock, was included in Gerber's category of "cuts and fills as shown" in his various proposals.
Gerber agreed that there was such a meeting and that the subject of rock was a topic covered at the meeting. Gerber's position was that by the terms of the request for bid, his bid proposals and their conversations, trucking the blasted rock was not part of his bid but was specifically excluded. The request for bid does not include in the list of tasks to be included in the contract blasting or items expressly related to blasting, and all of Gerber's various "proposals" state specifically that the proposal does not include "ledge excavation, blasting, and backfill". Gerber testified that Doran's notation "trucking if required" next to the "cuts fills" category simply meant that if trucking were needed to carry material away from areas high areas or to low areas, that trucking activity was included in his contract and was not an extra. Gerber's consistent position was that all activity associated with CT Page 10498 blasting, including the blasting itself, transporting the blasted rock to the crusher, crushing, and transporting the crushed product to its destination was excluded from the contract. The destination of the crushed rock, according to Gerber, was variously on-site locations, to provide fill or gravel, and off-site locations, where it was either discarded or sometimes traded for material which was needed on location.
In any event, Doran agreed to hire Gerber as the site construction contractor. They determined that there was too much rock to cart it off site in its blasted state, because, among other reasons, some of the chunks of rock would be too large to fit in standard trucks. Gerber subcontracted the crushing operation and arranged for Botticello, Inc., to supply an on site rock crusher. There was dispute at trial regarding the cost of the rock crushing operation. Doran testified that he thought the agreed upon amount was $4.00 per yard that he would pay Gerber and that the cost included associated items such as the loader and hammer. Gerber testified that the agreed upon price was $5.00 per yard and did not include the associated activities.
Work began on the project physically early in 1998, although the signed contract for Phase I was not signed until November, 1998, and the contract for the second phase was never actually signed. There apparently was little dispute at first. When Gerber billed for work that, according to Gerber, was not included in the contract between the parties, he submitted change orders for signature by Doran. He would then be paid for those items by Doran. Change orders #1 and #2 were submitted in approximately June, 1998, by Gerber to Doran. These were for items other than ones in dispute in this action, and the orders were routinely signed by Doran.
Change order #3 included charges for trucking rock by rock truck. This change order was in the amount of over $7,000 and also was paid by Doran. It is based upon daily slips presented by employees of Gerber to representatives of Doran; the slips evidence use of rock trucks, excavator and hammer on July 22 and 23, 1998. At trial, Doran testified that he paid that change order without protest because it involved work on an area of the project toward and in Vernon, which was not covered by the original bid and proposal. The better evidence, supplied by work slips in evidence, is that the Vernon work was not performed at that time.
When Gerber presented change orders #4 and #5, he and Doran became involved in a serious argument. Change order #4 included invoices for work done from the middle of July through the middle of August, 1998. It included charges for a bulldozer, rock trucks, an excavator, a rock crusher and triaxle trucks, all at various hourly rates. The change order CT Page 10499 was supported by invoices signed by Doran or agents or employees of Doran and was in the amount of $26,862.50.
Change order #5 was presented at about the same time as change order #4. It is several pages long and includes billing for work done between the middle of August and the middle of September, 1998. It includes equipment for hauling, breaking and crushing rock. The equipment for moving rock is billed at an hourly rate; the crusher is billed at $5.00 per yard. Some of the charges include work that Gerber did himself that he claimed was not included in the contract with Doran; other charges included work that Gerber subcontracted out, and then charged back to Doran with a percentage for himself. Each of the hourly slips for equipment was signed either by Doran or by a representative of Doran. The amount of rock crushed, and thus billed at $5.00 per yard, was determined by the number of truckloads of rock taken away from the crusher; in addition, there was a pile of crushed rock by the crusher, the volume of which was later estimated. The total amount of change order #5 was $200,970.00.
This is a lot of money, and Doran protested. Doran's fundamental position apparently was that all of the crushing operation was to be included in the per yard cost of crushing, and he also thought that he had agreed to the lower cost of $4.00 per yard crushed in any event. He believed that the trucking of rock to and from the crusher was in any event not an extra, because it had been included in the original proposal. Gerber's fundamental position was that the trucking of blasted rock had not been included in the original contract and that they had agreed to the figure of $5.00 per yard for crushing. After the argument, Doran paid the full amount of the change orders, even after Gerber volunteered to reduce the bill by $25,000. Doran stated that he paid the full amount under pressure to finish the job: he had several contracts in place for homes and the project at that point was in full swing. If he in effect fired Gerber, he would have had to find another contractor to make a massive commitment to the project, and he doubted that he could find a substitute without causing significant delay.
Phase I of the project was completed insofar as site work was concerned by approximately September 21, 1998. Doran independently contracted the rock crushing operation to Manchester Material for Phase II, rather than pay for a subcontractor through Gerber. Doran's cost for rock crushing in Phase II was considerably less than for Phase I. Gerber continued with the site work for Phase II, however.
Gerber also performed excavation work on the individual lots of the subdivision. It is agreed that the individual site work was not included in the original contract. A dispute arose as to the proper amount of CT Page 10500 payment for this work. The first three lots were completed on a "time and materials" basis. Both sides testified that the "time and materials" basis required the submission of a great deal of paperwork, and they decided on a price of $5,000 per lot. According to Gerber, the $5,000 was not sufficient and the parties agreed after several lots were completed at that price to raise the price to $6,800 per lot. It is agreed that 13 lots were not paid for by Doran and Gerber, in a counterclaim, is seeking payment for those lots.
Gerber also claims that in order to facilitate the closings on various lots, Doran forged his (Gerber's) and others' names on a form purporting to release any mechanic's liens that they might have and alleges damages as a result. Doran admits to having signed their names, but claims it was, either expressly or impliedly, done with the consent of those whose names were signed.
When the project was nearing completion, it became increasingly clear to Doran that the subdivision may not make a profit. Until that time, apparently, Doran had been optimistic that the project would be profitable. Doran told Gerber that he would have to wait for payment for the remaining thirteen lots until all of the houses were sold. Gerber became protective of his interests at that point, and threatened to place mechanic's liens on the unsold lots. To his credit, Doran did not sign others' names to waivers of mechanic's liens after payment became a dubious proposition. Rather, he convened a meeting of the contractors and explained the situation. In any event, Gerber did place liens on the remaining lots, and they sued each other. Gerber complained to the South Windsor police about Doran's having signed his name to the previous waiver forms.
The foregoing is a rough synopsis of the framework of the dispute. A great deal of detailed evidence was presented. For example, one issue at trial was whether Gerber billed for the disposition of more rock than was actually blasted. People from Ravizza Brothers testified about the amount of blasting material used, and ratios whereby the amount of blasting material can be converted, roughly, into the number of pounds of rock blasted, which in turn can be converted, very roughly, into yards[2]. Doran's position was that virtually all of the rock which was actually blasted and then crushed was found in the large piles by the crusher the volume of which was later calculated. Gerber testified that many truckloads of rock were transported directly from the crusher for use in various locations on the site, and some was trucked off premises and traded for other materials for the job. In any event, I will discuss the specific evidence with respect to the findings I make regarding the specific claims. CT Page 10501
Each side brought an action against the other. Because Gerber's complaint is repeated virtually verbatim in his counterclaim to the action brought by Doran, I will consider for the purpose of organization only the action brought by Doran, No. CV 00-0596922. In his complaint, Doran has alleged much of the background mentioned above. The first count alleges that an agreement was reached whereby Gerber would complete the site work on Phase I for a total of $734,095.00. The complaint claims that after construction was begun Gerber requested Doran to test for the presence of ledge rock, and, on doing so and finding rock, Doran contracted independently with Ravizza Brothers to blast for the sum of $317,864.00 Doran alleges that Gerber was informed of the amount budgeted for site work for the whole project and for individual lots. He further alleges that Gerber never informed him that he was going to charge extra for trucking and crushing the rock, once blasted, but nevertheless charged $234,842.50 for trucking and crushing. The complaint alleges that the change orders in which those charges were made were never signed for by Chase Orchards, LLC.
Doran then alleges that when the question of the additional charges arose, he was told by Gerber that the cost extra charge would be more than equaled by the savings in not having to pay for additional gravel for site work, because the rock crushing operation would create gravel which could be used on-site. He also claimed that Gerber represented that excess gravel could be sold for a profit. Relying on the representations of Gerber, it is claimed, Doran paid the claimed extras, and suffered damages as a result. The representations were allegedly false and made with reckless disregard as to the truth. The amount of damages based on the reckless misrepresentations is said to be $290,630.50, based upon the amounts paid to Gerber, the loss of promised revenue, less an amount credited toward the completion of Phase II. The second count incorporates by reference much of the first count and claims negligent misrepresentation.
The third count alleges that Gerber had agreed to charge a total of $348,172.00 for Phase II of the Chase Orchards development, and he had represented that the only additional charges would be for blasting. But change orders totaling $33,695.50 were presented to Doran, who never signed them. Doran paid the amounts of the change orders only because he feared that the project would be shut down if he refused. Because of the additional costs incurred, both because of having to pay Gerber and because of having to pay additional amounts to other truckers and for rock crushing and breaking, Doran claims that the alleged misrepresentations and breach of contract cost him $109,183.00.
The fourth count is concerned with the price of the work on the individual lots. Doran claims, as noted above, that he agreed to pay CT Page 10502 $5,000 per lot, but ended up paying $6,800 per lot, which he paid "under duress" because Gerber had threatened to stop work and to refuse to sign lien waivers if he were not paid $6,800 per lot. The difference in price times the claimed number of lots is allegedly $73,800.00.
Doran alleges in the fifth count that Gerber performed the some of the work he did in a negligent manner, used loam profligately and may have removed loam from the premises, thus causing Doran to spend an additional $177,100.00 to correct and repair the damage, and that Gerber has also not certified to the towns in which the development is located[3], so that Doran has not yet been able to obtain a release of his bond.
Finally, Doran claims that all of the above constitute a violation of the Connecticut Unfair Trade Practices Act, §§ 42-110a et seq. of the General Statutes ("CUTPA").
Gerber filed an answer, together with special defenses and a counterclaim. The answer, very generally, admits the relationship and denies wrongdoing. The defenses allege, first, that Doran paid for the work without reserving rights and thus waived any claim he might have. He claims, second, that by falsely signing lien waivers Doran breached the implied covenant of good faith and fair dealing. He claims that Doran is estopped from enforcing any rights he may have because of the signing of the lien waivers. His fourth defense is that any damages claimed by Doran to be the result of Gerber's negligence are the result of Doran's own negligence.
Gerber's counterclaim alleges that about May, 1998, Doran and Gerber entered into an oral agreement whereby Doran agreed to pay $5,000 per lot for certain site work. Gerber also performed additional extra work and Doran agreed to pay for it. Later, however, rather than deal with all the extras, Doran and Gerber agreed on a new price of $6,800 per lot which contemplated all the excavation type work for the lots. Between July, 1999, and January, 2000, Gerber claims that he performed work on thirteen lots for which he was not paid, claims a breach of contract and seeks payment of $88,600.00 plus interest pursuant to § 37-3a of the General Statutes.
The second count of the counterclaim alleges the same scenario as the first count and claims unjust enrichment, in that the labor and materials expended on the thirteen lots conferred a benefit to the lots, and Gerber would reasonably be expected to pay for the benefit.
The third count of the counterclaim alleges that Doran forged Gerber's name on lien waivers and in doing so harmed Gerber. The fourth count alleges that Doran, in acting as alleged in the prior counts, also CT Page 10503 violated CUTPA.
In the companion case, Gerber Construction, Inc. v. Chase Orchards,LLC, No. CV00-0596761, Doran is also named individually[4] on the forgery count. And in his answer in the companion case, Doran asserts that he paid, and thus is entitled to the defense of accord and satisfaction.
The first count of the complaint sounds in misrepresentation. There is little dispute as to the appropriate standards to apply, as the dispute is largely factual. In order to prevail, the plaintiff must show: (1) a false representation made as a statement of fact; (2) that the statement was untrue and known to be untrue by the person making the statement; (3) that the statement was made to induce the other party to act in reliance on the statement; and (4) that the other party did so act to his detriment. See, e.g., Citino v. Redevelopment Agency, 51 Conn. App. 262,275 (1998). The standard of proof is higher than a the usual preponderance standard. Meyers v. Cornwell Quality Tools, Inc.,41 Conn. App. 19, 34 (1996).
The gravamen of count one factually is the claim that there was no agreement regarding the trucking of blasted rock other than that it was included in the contract, and that it was only on the representations of Gerber to the effect that there would ultimately be savings realized through the use and sale of the crushed rock that Doran agreed to pay the change orders, especially Change Orders #4 and #5. On a consideration of all the evidence, I do not believe that Doran has established this fundamental prerequisite. Several considerations persuade me.
First, and perhaps most compellingly, it is clear that blasting was excluded from the contract and there is no dispute regarding this. The contact with Ravizza Brothers was apparently made through Gerber, but the contract was between Doran and Ravizza. It is also clear that the amount of rock was considerable and known by everyone involved to be considerable. Ledge rock was visible on the surface in several areas, and the test holes dug early on show, if nothing else, a lot of rock. The cost of blasting, and, correlatively, the risk of greater than anticipated cost of blasting, was to be borne by Doran. It would not be consistent to shift the risk of trucking a greater than anticipated amount of blasted rock to and from areas on the site to Gerber, just as Gerber did not bear the risk as to crushing and hammering rock. I find that the exclusion of trucking from the contract is consistent with the overall agreement of the parties.[5]
This understanding is reflected, though not entirely without ambiguity, in the series of writings exchanged by the parties. The CT Page 10504 requests to bid specifically exclude blasting. Gerber's various proposals specifically exclude "ledge excavation, blasting and backfill". Backfill and trucking for the cuts and fills were included in the contract, because they could be readily estimated at the outset.
Second, Doran or his agents did sign all the slips, or invoices, for trucking of blasted rock. Doran argues that these were frequently signed by office personnel rather than by himself and, in any event, did not indicate that Chase Orchards agreed to pay extra for each signed invoice. Gerber testified that it was industry custom to have the principal sign for extras but not for work within the contract. There would no need to present to the other side a record of work done within the contract, and certainly no need for the principal to acquiesce in the amount of time or materials expended by the contractor. There was evidence, which I credit, to the effect that the industry practice is to submit slips for signature for items that are extras and not to submit slips for items which are within the contract. It is not disputed that either Doran or agents or employees of Doran signed for each slip at about the time that the work was done. This is another indication that the work was not within the contract.
Additionally, Doran paid for the extras at the time they were submitted. There was an extensive argument at the time change orders #4 and #5 were submitted, but they were for substantial amounts and might well cause grounds for discussion even if there were not dispute as to whether they were in concept due. Had Doran really been under the impression that they were not due, there are many choices he could have made. Though he said he did not want to risk losing Gerber altogether because then the completion of the project would be at risk, he at the very least could have created a record in writing. Just paying, and being angry about it, does not seem to be consistent with a contractual agreement that the items paid for were within the contract.
I do find proved that Gerber more likely than not made statements to the effect that there would be some benefit derived from using the crushed rock on premises and selling some for gravel: this indeed happened to a degree and Gerber may have indicated that some of the impact of the cost of the change orders might be lessened. I do not find proved, however, the proposition that any such statement was made for the purpose of inducing Doran to pay, nor did Doran rely on the statement (s) to his detriment, because the items were extras in any event. Further, I do not find that any such statement was made as a factual representation with any specific amount of money. I find that the first count of the complaint has not been proved.
The second count is the same as the first, except the count sounds in CT Page 10505 negligent misrepresentation. I note that the degree of proof required as to this count is a preponderance of the evidence. For the same reasons as stated in regard to the first count, I do not find the second count proved.
The third count alleges that Doran incurred additional expenses as a result of Gerber's insistence on treating as extras the costs of crushing and trucking blasted rock to and from the crusher. The count is a hybrid of misrepresentation and breach of contract: the allegation is that at the time of the agreement as to Phase II, Gerber represented that the only additional costs would be for the blasting itself, as opposed to the additional items of crushing and trucking, and that change orders nonetheless were presented to Doran, who also had to pay for other contractors to carry out some of the trucking and crushing.
This count has not been proved, for several reasons. First, I find that the associated costs of blasting, that is, the costs of trucking the blasted rock and the crushing, were not included in the original contract or in the agreement, which apparently never was signed, as to Phase II. Second, Doran claims that the amount which he paid for the crusher included trucking. The evidence showed that Gerber hired Botticello to crush the rock at a price of $4.50 per yard and then charged Doran $5.00 per yard, and the price did not include trucking to and from the crusher. Doran testified that the agreed upon price between Gerber and him was $4.00 per yard, and the price included trucking. For a variety of reasons, including the testimony as to costs and industry customs, I credit the testimony of Gerber.[6]
The related, but to me parenthetical, issue has been raised as to the overall amount of rock blasted, and thus trucked, crushed and used or taken away. Doran claims that Gerber charged for much more rock than was actually blasted and processed. He bases his claim on inferences working backward from the amount of rock in the ground which was to be blasted. First, one Sigleski, an engineer who worked on the project, estimated the total amount of rock that had to be removed from trenches and elsewhere. He based his estimates on rough maps prepared by one Hector Rivera, an employee of Doran, who dug a number of test holes roughly in the center of the proposed roadways. Sigleski determined that the amount of rock to be removed was considerably less than the amount of rock included in Gerber's charges.
The second line was based on the plaintiffs interpretation of the amount of blasting material used by Ravizza Brothers. One Steven Sibley, a geologist, testified about the relationship between the amount of blasting material used and the correlative amount of rock which would be blasted as a result. The parties differ regarding the results of the CT Page 10506 calculations. There is some inherent uncertainty, and calculation of the swell creates more uncertainty. Each side has offered calculations which favor their points of view.[7] Although Sigleski's approach and the Ravizza approach are most interesting, they are inherently vague and are no substitute for actually counting the number of truckloads. I find that each truckload which was charged to Doran was accounted for on a slip presented to and signed by Doran or an agent or employee at the time the work was done. This is a far more accurate means of accounting for the amount of rock than either of the methods of estimating, and I do not find either of the models so compelling that they render the version which was recorded at the time of the transactions impossible. I find no inaccuracy proved.
The fourth count of the complaint alleges that the agreed upon price per lot excavated by Gerber was $5,000, after the first three lots were completed on a time and materials basis, and that Doran paid $6,800 because of the pressure of completing the project in a reasonably timely manner. The better evidence suggests that the $5,000 price was also subject to extras, and the price of $5,000 plus the extras exceeded an average of $6,800 per lot. I credit the testimony that an agreement was reached in the amount of $6800 and I do not find that there was any breach as to the price of the lot excavations.[8]
The fifth count alleges that Gerber performed the contract negligently, thereby causing damages to Doran, in that he had to hire other contractors to correct the work and to finish items left undone. The difficulty with this position is that Gerber offered to do the "punch list" work, and presumably to fix any items which were deemed unsatisfactory by any whose approval was necessary. I find that some items which were within Gerber's contractual work were not completed by Gerber, but I find no breach of contract by Gerber nor do I find it proved by a preponderance that any work was negligently performed. Finally, I simply don't find any credible evidence of any unfair trade practice of the part of Gerber in violation of CUTPA. Judgment may enter in favor of Gerber Construction, Inc., as to each count of the complaint.
I turn now to the allegations of the counterclaim. As mentioned above, the first count claims that the amount of $6,800 is due for each of thirteen lots. I find that amount of $88,400 is due, subject to credits and offsets of $6,000 for the finish grading on each of six lots which was not completed, $7200 which Gerber received from CATIC and $1,500 from Commonwealth for a total of $73,700. I further find that the amount was wrongfully withheld and that statutory interest pursuant to § 37-3a
is therefore appropriate. Two years at 10% yields an additional $14,740.00. The total due to Gerber on the first count is, then, CT Page 10507 $88,440.00.
The second count claims unjust enrichment for the same work as was claimed in the first count. I find the second count is made academic by a finding of the breach of contract as to the first count.
The more troublesome issue is the claim of forgery as to the lien waiver form. The facts are largely undisputed. As the closings on the houses were prepared, waivers of mechanics liens were required to satisfy the purchasers and lenders. Doran signed the names of contractors in different colors of ink and in different styles so that purchasers would think that the names were in fact signed by different people. All but thirteen houses were sold subject to the false documentation. Doran claimed that the contractors were aware or should have been aware of the practice, because they either gave their assent or circumstances were such that they should have been aware. As to Gerber specifically, Doran claimed that Gerber knew of the practice because of the earlier Chase Farms project, in the course of which Gerber allegedly authorized the signing of his name, and that he agreed to it. Gerber agrees that he was generally aware that houses were being sold and that he hadn't signed waivers, but he testified that he didn't give the matter a great deal of thought because he was being paid, until the end, and in any event there are other means by which contractors' interests can be protected at the time of closing. In any event, Doran signed Gerber's name only as to houses for which Gerber was in fact paid.
Is this, then, forgery? Pursuant to § 53a-140 of the General Statutes, a person is guilty of forgery in the third degree "when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument, or issues or possesses any written instrument which he knows to be forged." Pursuant to § 53a-137 (4) of the General Statutes:
 A person "falsely makes" a written instrument when he makes or draws a complete written instrument in its entirety, or an incomplete written instrument, which purports to be an authentic creation of its ostensible maker or drawer, but which is not such either because the ostensible maker or drawer is fictitious or because, if real, he did not authorize the making or drawing thereof.
Pursuant to § 53a-137 (5):
A person "falsely completes" a written instrument when, by adding, inserting or changing matter, he CT Page 10508 transforms an incomplete written instrument into a complete one, without the authority of anyone entitled to grant it, so that such complete instrument appears or purports to be in all respects an authentic creation of or fully authorized by its ostensible maker or drawer.
There can be little doubt that by signing the names of the contractors Doran intended to deceive, at a minimum, the purchasers. Even if there was no actual harm done by the actions, Doran as much as testified that he used the differing styles of signing so that the inexpert eye would be deceived into thinking that a number of different people had in fact signed the document. See, e.g., State v. Yurch, 37 Conn. App. 72, 80
(1995). Doran cites Rice v. Welch, 33 Conn. Sup. 523, 526 (Appellate Session of the Superior Court) (1976) for the proposition that:
 The word "permission" has a broad scope and it "is not necessarily limited to that granted by arrangement between the parties or otherwise in definite, express terms. It may arise, and be implied, from a course of conduct, pursued, with knowledge of the facts, for such time and in such manner as to signify, and be compatible only with, an understanding consent amounting to a grant of the privilege involved." Tomasetti v. Maryland Casualty Co., 117 Conn. 505, 508.
If there was consent, implied by knowledge of the circumstances and acquiescence, then the argument could be made that the making or alteration was authorized. I believe, however, that Gerber proved by a preponderance that the lien waivers were forged in violation of §53a-140 of the General Statutes. I do not find proved, however, the proposition that the violation caused any damages in the circumstances of this case. It appears undisputed that the unpaid work was performed only on lots for which lien waivers were not forged.
Finally, I do not find the CUTPA claim proved. Except for the forgery, I do not find the sort of deceptive or unscrupulous conduct proscribed by CUTPA, and I do not find that the forgery caused substantial injury, at least on the facts presented.
Section 42-110b (a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." In determining when a practice is unfair, we have "`adopted the criteria set out in the CT Page 10509 "cigarette rule" by the federal trade commission . . . "(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)]." Conaway v. Prestia, [191 Conn. 484, 492-93, 464 A.2d 847 (1983)], quoting FTC v. Sperry Hutchins on Co., 405 U.S. 233, 244-45 n. 5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972).' McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 567-68, 473 A.2d 1185
(1984); see Statement of Basis and Purpose of Trade Regulation Rule 408,
 `Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking,' 29 Fed. Reg. 8324, 8355 (1964)." Atlantic Richfield Co. v. Canaan Oil Co., 202 Conn. 234, 239, 520 A.2d 1008 (1987); Daddona v. Liberty Mobile Home Sales, Inc., 209 Conn. 243, 254, 550 A.2d 1061
(1988).
 "Moreover, in 1980 the commission `reviewed those factors and concluded that "[u]njustified consumer injury is the primary focus of the FTC Act, and the most important of the three . . . criteria.'" D. Rice, "Consumer Unfairness at the FTC: Misadventures in Law and Economics,' 52 Geo.Wash.L.Rev. 1, 4 (1983), quoting letter from FTC commissioners, December 17, 1980. `[T]he Commission explained that regulation is permissible only if a practice causes [unjustified] injury that is substantial. . . .' Id." Atlantic Richfield Co. v. Canaan Oil Co., supra, 242-43.
"In discussing the third criterion, the federal trade commission has stated: `The independent nature of the consumer injury criterion does not mean that every consumer injury is legally "unfair," however. To justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any counterfeiting benefits to CT Page 10510 consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided' Letter from Federal Trade Commission to Senators Ford and Danforth (Dec. 17, 1980) (reprinted in Averitt, `The Meaning of "Unfair Acts or Practices" in § 5 of the Federal Trade Commission Act,' 70 Geo.L.J. 225, 291 [1981])." (Emphasis added.) McLaughlin Ford, Inc. v. Ford Motor, supra, 569-70. This test is "equally applicable when a business person or competitor claims substantial injury." Id., 570.
A-G Foods, Inc. v. Pepperidge Farm, Inc., 216 Conn. 200, 215-16 (1990).
Although I cannot condone the practice of forging signatures, I do not find that the practice in this case caused substantial injury, and the fourth count of the counterclaim is not proved.
Judgment may enter accordingly.
 ___________________, J. Beach